IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2020 Session

## STATE OF TENNESSEE v. JESSICA COX

**Appeal from the Criminal Court Court for Knox County
No. 102586B     Bob R. McGee, Judge**

---

### No. E2019-00026-CCA-R3-CD

---

The defendant, Jessica Cox, appeals her Knox County Criminal Court jury convictions of aggravated child abuse and reckless endangerment, arguing that the trial court erred by excluding evidence of an expert witness, that the trial court erred by excluding certain testimony and preventing her from mounting a defense, and that the evidence was insufficient to support certain convictions. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gerald L. Gulley (on appeal) and Rhonda F. Lee (at trial), Knoxville, Tennessee, for the appellant, Jessica Cox.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Knox County Grand Jury charged the defendant by presentment with 29 counts of aggravated child abuse against her two stepsons.[1]

At the March 2017 trial, John Sharp, a patrol officer with the Knox County Sheriff's Office ("KCSO") testified that on May 28, 2013, he responded to a call at Farragut

---

[1]     The co-defendant, the defendant's husband, was charged in the same presentment with 16 counts of aggravated child abuse and two counts of child abuse. Sometime prior to trial, the co-defendant pleaded guilty to all but one count of child abuse, and the trial proceeded only as to the charges against the defendant.

High School ("FHS") where he found the victims, A.M. and J.M.,[2] handcuffed together. He noticed that whereas properly applied handcuffs should allow for "some freedom of movement," the handcuffs on the victims "were extremely tight, indented into the skin, to the point where . . . it caused pain for me to try to get the handcuff key into the slot to . . . take the handcuffs off." He explained that handcuffs have "a double bar on one side of it, then there's a single bar that swings around through it," and on A.M.'s wrist, "[y]ou could see all three of the bar marks on both sides of his wrist where it had clamped down." J.M.'s wrist also had "some kind of marks going across the wrist and then bruising down . . . below it." Both of the victims' forearms were "swollen and irritated and it looked pretty painful." He noted that the photographs of the victims' injuries did not adequately show how bad the injuries appeared in person.

Officer Sharp described the victims as appearing "underweight" and "malnourished and not very well taken care of." Additionally, the victims' clothes were dirty, and Officer Sharp noticed "a distinct odor about them. It just smelled dirty, kind of putrid, just . . . you couldn't tell where it originated from, just from the general area[,] . . . dirty clothes, infection, all the above I guess." A.M. had an injury on one of his feet, and "[y]ou could see the skin peeling up. Looked like they tried to wrap some kind of Ace bandage around it that was dirty and had been dragging along and him walking on it. His foot was swollen and, I mean, huge and spongy." He felt one of the victims' arms and described it as "spongy and . . . just feels like they're full of fluid." Officer Sharp pointed out a photograph that showed A.M.'s swollen legs with the right leg being more swollen than the left. A.M. told Officer Sharp that he sustained the injury to his foot because the defendant would hit him with a rolling pin, hammer, and mallet while he was handcuffed to a kitchen cupboard.

He learned from the victims "that their stepmother had handcuffed them together" on either side of a kitchen cupboard for "stealing food," but J.M. "was able to climb through the back side of the cupboard, so they were both on the same side so they could get out. And they exited through a bedroom window and then was able to walk to . . . Farragut High School." The victims described the defendant as "the main problem" and said that the co-defendant "kind of went along with it."

After removing the handcuffs from the victims, Officer Sharp called for an ambulance, "secured the handcuffs in an evidence bag," and "started making some phone calls." He noted that the handcuffs had a safety feature called a "double lock," which was a "little slot . . . [with] a pin in it" to prevent the handcuffs from "ratcheting down to avoid" injury like those to the victims' wrists. Officer Sharp determined that this sort of treatment had been going on "for a period of time" and "was something that . . . they were used to

---

[2] Because the victims were minors at the time of the offenses, we will refer to them and their relatives by their initials to protect their anonimity as is the policy of this court.

and was not, like, something that just occurred, that they kind of become accustomed to it." A.M. told him that they sought out help because "he had just become tired of it." A.M. expressed concern about being returned to their home, and when Officer Sharp assured him that would not be the case, A.M. looked relieved.

Because Officer Sharp expected this to be a "significant" and "difficult" case for the victims, he avoided asking the victims too many questions or examining them at that time, knowing that they would have to repeat the process with detectives, Child Protective Services ("CPS") and Department of Children's Services ("DCS") personnel, and doctors. "I'd rather just put them through this one time -- or as few times as possible and not for each person they come in contact with." He also did not photograph the victims at the school "because I wanted to get them to the hospital and get them evaluated and cleaned up and get them something to eat."

After the victims were taken to the hospital, Officer Sharp and other officers went to the victims' home on Canton Hollow Road, where he spoke with the co-defendant who told him that the victims "had left and [the defendant] had gone out looking for them." The defendant arrived at the home approximately 15 minutes later, acting "normal" and not visibly upset. Officer Sharp described the house as a trailer with "a lot of stuff inside," including "cupboards on each side" and a bedroom on each end. The co-defendant gave his consent for the officers to search the house, and Officer Sharp noticed several things that were consistent with the victims' allegations. "Under one of the kitchen cabinets, . . . there was a door off. You could kind of look in and you could see there was, like, the ends of a mallet and a hammer sticking up . . . ." He also found a handcuff key hanging on a trophy in a bedroom, which key "was the kind that . . . comes with handcuffs. . . . It was [a] small key which had the double lock pin on it also."

Richard James Huff, who worked as a custodian at FHS on May 28, 2013, arrived at the campus at approximately 6:00 a.m. that day. While sitting in his vehicle, he saw the victims near the "main entrance of the building," and the victims approached him. School had already ended for the summer break, and he was not expecting to see any students on campus that day. Mr. Huff recognized A.M. as a student at FHS, and A.M. asked whether a certain teacher was on campus that day. Mr. Huff told the victims that teachers were not there and asked if the victims needed help; the victims held up their arms, revealing that they were handcuffed together. Mr. Huff stated that he first thought that the victims had handcuffed themselves together while playing until he noticed that the handcuffs were "really tight" and that their hands were swollen to "probably twice the size of . . . normal." He walked the victims to the main building of campus, and A.M. asked Mr. Huff not to call the police out of fear that the police would call the defendant to come pick them up. Mr. Huff notified his supervisor, Edna Owsley, who was also on campus at that time, and she came outside to assist. Mr. Huff gave the victims Pop-Tarts from a

vending machine and called 9-1-1.

Although Mr. Huff had bolt cutters, he and Ms. Owsley determined that it was best to wait for the police to arrive before removing the handcuffs. He described the victims as appearing "really scared" and "very hungry." A.M. was wearing "flip-flops," and Mr. Huff could see that his "feet was swelled really bad. I can't even -- can't even give a description on how bad they was swelled, but the -- they looked really bad." In addition to the injuries to A.M.'s feet, Mr. Huff saw visible injuries to the victims' arms and bruising on their legs. A.M. told Mr. Huff that he had been handcuffed "[c]ontinuously for a few days."

During cross-examination, Mr. Huff stated that A.M. had not told him how many days specifically he had been handcuffed but A.M. "had said that he had been handcuffed a few times . . . in the weeks prior to all this, that they had been handcuffed more than just that one time."

Edna Owsley, the head custodian at FHS, testified that, on May 28, 2013, she arrived at work at approximately 6:30 a.m. At some point, Mr. Huff came to her office looking for bolt cutters to remove handcuffs from the victims. She went outside and saw the handcuffed victims and advised Mr. Huff not to remove the handcuffs because "[s]omebody else had to see them besides us." She noticed that the victims had injuries under their chins and that A.M. had an injury "on his right foot" that appeared to be a burn. The victims "act[ed] like they were scared to death," "[s]cared and hungry and dirty. They definitely needed a bath." While Mr. Huff called 9-1-1, Ms. Owsley "was trying to keep [the victims] calm. They were upset. They were afraid that we'd take them back home. They begged us not to, not to take them home." She also noted that "[t]hey were so skinny when I first saw them. It was just unreal."

A.M., who was born in 1996, testified that in January of 2013, he lived with his father, the co-defendant, and his stepmother, the defendant, on Canton Hollow Road. His brother, J.M., also lived there, and his stepbrother, T.C., lived there "[s]everal times a week." A.M. had two stepsisters, A.C. and A.P., who did not live at that residence. In January and February of 2013, A.C. would visit the Canton Hollow residence "occasionally" but then stopped coming all together.

On Memorial Day weekend of 2013, the co-defendant, the defendant, and T.C. went to Gatlinburg, and A.M. and J.M. were left at home. Before leaving on the afternoon of May 26, the co-defendant handcuffed A.M. to a lower cabinet in the kitchen, which A.M. called the "Tupperware cabinet," in a seated position with his hands behind his back. The co-defendant also put a sock in A.M.'s mouth and blue tape "around my entire head -- around my entire mouth," leaving space for him to see and breath. A.M.

-4-

stated that the co-defendant handcuffed A.M. in that instance at the defendant's direction, and the defendant wanted the sock in A.M.'s mouth so that he could not communicate with anyone. A.M. described the handcuffs as "very painful. I lost part of feeling in both of my hands. And it was very hard to move muscles in my arms." Ten to 15 minutes after the defendant and co-defendant left, J.M. removed the handcuffs, using the handcuff key that was kept on a soccer trophy in the master bedroom.

After J.M. removed his handcuffs, A.M. immediately got some food because he "hadn't eaten in several days" and "was very hungry," and then he watched J.M. play Xbox. A.C. arrived at some point that evening, and when the victims heard her car arrive, A.M. returned to the cabinet where he had been handcuffed, replaced the sock and tape over his mouth, and put his hands behind his back. He was unable to put the handcuffs back on because his "arms were very sore from earlier events, and I could not get them to go back behind my back, as they were supposed to, but I just played it off." A.M. was "extremely fearful" of being discovered out of the position that the defendant and co-defendant had left him in. When A.C. entered the house, she went up to A.M. and said, "If I could take you to your grandparents' house, I would, without my mom being in trouble." He then showed A.C. that he was already out of the handcuffs, and A.M. and J.M. told A.C. "the bad things that had been happening since she had seen us last." A.C. made macaroni and cheese, then she and A.M. watched a movie in the master bedroom while J.M. continued to play Xbox. After A.C. fell asleep, A.M. "might have got in the fridge a couple more times" and then fell asleep on the couch in the living room. A.M. noted that this "was also the first time I had laid down on any surface or had a pillow or a blanket to use" since January of that year.

The next morning, May 27, A.C. left to go to work, and the defendant called to tell J.M. that they were on their way home and they would bring Sonic back for him "as long as everything was good." J.M. told the defendant that "everything was going fine," and A.M. intended to resume his handcuffed position at the kitchen cabinet before the defendant and co-defendant returned home. A.M. and J.M. cleaned up the house to "make it look presentable for them and not make anything look suspicious." At some point later that day, the defendant called J.M. again, and "[v]ery soon after that, within a couple minutes, I believe, they arrived" home. A.M. speculated that "it was kind of just a test, maybe, to see what [J.M.] was doing, to make sure that . . . he had followed the rules like had been laid down to him." When the defendant and co-defendant arrived home, the front door was locked, and when the victims heard them knock on the door, A.M. ran back to his handcuffed position in the kitchen and "tried to put my arms behind my back with the sock and tape over my mouth and just play it off as if nothing had happened." J.M. turned the Xbox off and went to the door, and he waited until A.M. nodded that he was ready before he unlocked the door.

-5-

The defendant and co-defendant were "immediately suspicious" of why it took J.M. 30 to 45 seconds to open the door, and J.M. told them that he was checking to see who it was. They did not believe J.M., and A.M. told them that J.M. had been playing Xbox. The defendant told A.M. that because he had been honest and J.M. had not, A.M. would get the food from Sonic. When the defendant leaned A.M. forward to remove his handcuffs, she realized that he was not actually handcuffed to the cabinet any longer and she called for the co-defendant, who had realized that the handcuff key was missing from the soccer trophy. A.M. stated that the defendant "was angry" about his having been unhandcuffed. The co-defendant, by contrast, had "a blank face sort of thing," and he realized "it was just another thing he had to handle." The defendant then "start[ed] yelling and just carrying on about how me and my brother are both bad children and should be gotten rid of."

A short time later, the defendant kicked A.M. in the face, making contact with the "tip or center of her shoe." The defendant then started "going off" and demanding to know if the victims had told A.C. about the abuse. Upon the defendant's repeated questioning, A.M. eventually told the defendant that they had told A.C. what had been going on at the house. The co-defendant then handcuffed A.M. and J.M. together by one wrist each with the handcuff chain behind the center slat of an upper kitchen cabinet, which A.M. estimated to be five feet off of the ground. The victims were made to stand there, handcuffed together for several hours. A.M. stated that the handcuffs were not locked on that occasion, and they tightened on A.M.'s wrist when J.M. moved his arm. The defendant called A.C., and A.M. could hear the defendant's saying that the victims "were bad children and deserved to be punished in the manner of how they wanted and choose to" and that it was not A.C.'s place to "pick [the defendant's] parenting style" or "determine how . . . [the victims] should be punished or raised." A.M. recalled feeling very frightened because the defendant was "very angry" and told the co-defendant that she needed him "to get rid of us and take us someplace else." A.M. recalled hearing them talk about military school.

J.M. was angry at A.M., "whispering that he would never allow me to be unhandcuffed when they left ever again." The defendant then "got a rolling pin and started hitting [A.M.] on the feet with it," which he described as "the worst pain I've ever felt in my life." Before being hit with the rolling pin, A.M.'s feet were already "swollen to the size of a large can, and there was a very large wound on the top of my right foot that was incredibly visible. My legs were also swollen from standing for so long." A.M. explained that in addition to the few hours he had been standing at that time, he "had been standing the previous week for one week straight." The wound on his right foot was "the size of, maybe, a slice of pepperoni" and "was very large and very red and . . . very just bad looking." A.M. stated that at some point, the wound on his foot had developed "a large pocket of puss, about the size of, like, a little ball," and the co-defendant "popped it" like a blister, "and a lot of fluid came out of it." He described the rolling pin as a thick, foot-

long piece of wood with handles on each end and a metal rod inside. A.M. estimated that the defendant hit him 10 to 15 times with the rolling pin, causing him to scream in pain. The defendant also hit A.M. in the back of his head with a can opener, which A.M. described as silver with two "blue rubber handles."

Sometime later on the night of May 27, the co-defendant moved A.M. and J.M., and re-handcuffed them in a seated position to the lower Tupperware cabinet with the handcuff chain "looped around the wood center so we could not move." At that point, A.M. was handcuffed by his right hand and J.M. by his left hand, and both victims were facing away from the cabinet. The co-defendant told the victims "that he was going to get rid of us and take us someplace." At approximately 9:00 p.m. or 10:00 p.m., the defendant kicked A.M. in the head again and left the house with T.C. When she returned, she re-positioned the victims, ordering J.M. "to face into the Tupperware cabinet" and A.M. to remain facing outward and handcuffed each victim by his left hand in order to "make it harder on me and [J.M.] to move around." The defendant did not lock the handcuffs to prevent them from tightening.

After everyone else in the house had fallen asleep, A.M. and J.M. began "whispering about what we would do. We had both come to the conclusion this had been enough and that we were going to run away." They determined to leave through a window in the front bedroom because the front and back door made too much noise and because T.C. was sleeping on the couch in the living room. A.M. stated that the way that the defendant had handcuffed the victims, had "actually . . . made it easier for us to get out." J.M. "very quietly" "crawled through the bottom of the Tupperware cabinet," freeing the victims from the cabinet although they were still handcuffed together. After waiting a few minutes to ensure they had not woken anyone else up, "we slowly started walking towards the hallway." A.M. noted that the time was 3:45 a.m. when they entered the front bedroom, where they had to move several items, including a dresser and a window air conditioning unit, to access the window. The victims tossed their flip-flops out of the window, which was approximately one foot off of the ground, and they climbed out one at a time. Although J.M. suggested leaving the window open in case they needed to return, A.M. stated that he "knew we were not going back" because if the defendant or co-defendant discovered that they had left the house, their lives "would be put in jeopardy," and they closed the window.

Once outside of the house, the victims walked to a neighbor's house and took a solar-powered light from the yard because it was still dark outside. At one point, while the victims were walking down Canton Hollow Road, they heard a vehicle approach, and they hid behind a house, fearing that it was the defendant looking for them. A.M. stated that it was painful for him to walk or run because of the injury to his right foot and because he "hadn't used my feet that much in a very long time." The handcuffs were also painful because "they kept tightening" as the victims moved. They first walked to the Kroger in

Farragut, but while in the store, they hid their handcuffs from view, and a Kroger employee denied them use of the telephone. They then walked to a Krispy Kreme at approximately 5:30 a.m., where they saw employees working inside. They knocked on the window of the store, but the employees "said they weren't open at that time, so they didn't let us in." They then walked to a McDonald's, where they knocked on the drive-thru window, and an employee came outside to talk to them. That employee permitted A.M. to use a cellular telephone to call a friend and ask for a ride. He also called his grandparents to "let them know that there is a situation going on" and that they were safe. Neither his friend nor his grandparents answered the calls, and he left voicemails. A.M. stated that the employees of Krispy Kreme and McDonald's saw that the victims were handcuffed together. After leaving McDonald's, the victims walked back to Kroger, where A.M. ate some peanut butter fudge in the store, and they took some other food items and "just kind of walked out with it." A.M. stated that he did not call the police because he "was really afraid that they weren't going to do anything; that we would have to go back" to live with the defendant and co-defendant.

After leaving Kroger, the victims walked to FHS and sat down in front of the gym to eat the food they had taken from Kroger and wait for the shop teacher to arrive because A.M. knew that she had "pliers or some type of chain cutter" to remove the handcuffs. When Mr. Huff arrived on campus, they approached him. A.M. stated that Mr. Huff "seemed shocked," and the victims told him "that our parents had done this to us and we didn't want to go back." A.M. called his grandparents again shortly before 7:00 a.m. but again had to leave a voicemail. Mr. Huff brought the victims Pop-Tarts, and Ms. Owsley joined them outside, telling them that she needed to call the police. A.M. became afraid because he "didn't know what would happen. I just thought that the police would take us back to our parents and I did not want that to happen." Officer Sharp was the first to respond, followed by several other officers and an ambulance. "The EMTs did a quick little run-over with me and [J.M.] to see if there was anything they needed to be concerned about immediately" then took them to East Tennessee Children's Hospital ("Children's Hospital"). A.M. could not recall a time that he had ever seen a doctor before being taken to Children's Hospital in this case.

At the hospital, A.M. spoke with "detectives, nurses and two agents with Child Protective Services." By that time, it had been "a day or two" since he had slept. The jury viewed photographs of the victims' injuries. A.M. had injuries to his wrists from the handcuffs that he had worn for "[m]aybe a couple weeks." He had a "mark on one of my toes" from the defendant's "jumping up and down on my feet, [and] using a rubber mallet and/or rolling pin." Although many of his injuries had "significantly healed" by the time of trial, A.M. stated that he had "several permanent scars on [his] wrists" and that the large wound on his right foot had not fully healed, causing him pain when he was "on [his] feet or something like that." A.M. stated that the injuries to his feet, legs, and wrists were

-8-

visible to the defendant and co-defendant while he was living with them. On one occasion, A.M. alerted the defendant to "marks on my knees" with "skin peeling off and . . . some type of puss or something forming and possibly an infection," but the defendant "said something along the lines of, that's your fault."

From the photographs, A.M. identified bruises to his ankle, waist, thighs, arms, and other parts of his body that were caused by his being hit with a mallet and a rolling pin. He stated that the co-defendant hit him with the rolling pin on only one occasion. He also had marks on his knees that were caused from the defendant's forcing him to kneel on uncooked rice on a wood floor a few months prior, which injuries "took about eight or nine months" to heal. He was handcuffed while kneeling on the rice, but he could not recall who had placed the handcuffs on him in that instance. Kneeling on the rice caused "very excruciating pain," and if he "move[d] the rice around using my legs or something," the defendant or co-defendant would hit him. At one point, the defendant "c[a]me out with a rolling pin and hit me . . . on the head because the rice was not appropriately under my knees."

A.M. had a bruise on his back from being hit with a belt, which both the defendant and co-defendant would use on him. A.M. described one occasion when he was home alone with the defendant, and he managed to slip out of the loose handcuffs. When the defendant found him unhandcuffed, "[s]he immediately came out and started screaming. She hit me several times. She had came out with an incense stick . . . and burned the underside of my chin." He stated that the burn scar on his chin was permanent. On the same day, the defendant burned the tip of A.M.'s penis with a cigarette. He recalled that he had been forced into an ice bath, after which the defendant burned him with the incense stick and then pulled down his boxer shorts and burned him with the cigarette.

A.M. described several instances of abuse involving the bathtub:

There were several occasions where [the defendant] would fill up a bathtub in her bedroom. She'd fill it up with cold water about halfway up. She would have [J.M.] go get ice cubes or a couple of ice trays from the freezer in the kitchen and dump all the ice in there. She would make me get in it.

Several occasions -- or several other occasions, she would . . . hold my head down, hold my entire body down in the water. She had done this multiple times . . . throughout the span of a few weeks.

And then I remember one time she held me down for so

-9-

long that I . . . started to lose consciousness.  . . . I only remember being out of the tub after that.

> There was another occasion where she had put me down in the water and she had started squeezing all the shampoo that she had into my eyes and into my mouth.

A.M. estimated that he was held underwater in the bathtub "[a]t least four or five times." During each bathtub incident, he was handcuffed with his hands behind his back and was held face-down in the water.  A.M. stated that on one occasion, J.M. was also submerged in the bathtub.

From the photographs, A.M. identified bald spots on his head from "where [the defendant] would hit me in the head with the blue can opener.  The metal would hit the top of my head.  When that happened, I would start bleeding immediately."  A.M. said that he was hit with the can opener multiple times, stating that the defendant would hit him with various objects "[t]oo many times to count."  "Most of the time it was the can opener or the rolling pin.  There were other times when she had to use a pan, like a frying pan.  She used her own fists, shoes, wire hangers, extension cords, anything she wanted to use as a weapon."  A.M. stated that he eventually "just got used to" the abuse.  He acknowledged that the co-defendant "might" have hit him in the head on occasion but "not as many times as [the defendant]."  A.M. also had injuries to his buttocks caused by "a combination of standing for a week at a time and then sitting down for a week at a time" and from being hit with various objects.

A.M. stated that he had been handcuffed for "[w]eeks at a time" during the period of abuse.  He described the handcuffs as having a locking device "to stop them from getting any tighter around my wrists," and the co-defendant would usually activate the locking device, but the defendant would not.  When the locking device was not activated, the handcuffs "can get tighter until they stop the circulation in your arms or hands."  At times, the defendant would manually squeeze the handcuffs until they tightened around his wrists.  Other times, the handcuffs would tighten around his wrists simply by his moving while handcuffed to a cabinet.  A.M. recalled that J.M also had injuries to his wrists from the handcuffs, but they were not "as deep or as scabbed looking" as A.M.'s injuries.  A.M. stated that, although he was afraid of both the defendant and the co-defendant, he primarily feared the defendant "because she was the ring leader" of the abuse, and the co-defendant "would do what she said to do."

From January 2013 to May 28, 2013, A.M. did not attend school other than for three days at the beginning of the semester.  During his first week out of school, he and the defendant "were kind of friends with each other."  The following week, "it started going

-10-

downhill with little things. Either I couldn't clean the house good enough for [the defendant]; I didn't take the dog outside to use the bathroom enough for her; I just wasn't good enough for her." From that point on, A.M. "started being handcuffed to . . . other objects, starting with the oven and then going on from cabinets to different cabinets." He had also been handcuffed while "just sitting down or standing with my arms behind my back and in front of me." Because J.M. and T.C. remained in school during this period and because the co-defendant worked weekdays, A.M. and the defendant were home together each weekday until approximately 4:00 p.m.

When A.M. was handcuffed, he had to ask to use the bathroom, and, if he was not released to use the bathroom, he would urinate and defecate on himself. When that happened, he would "be in a whole lot of trouble," and the defendant would hit him "with whatever it is she wanted to hit me with. Mostly the rolling pin or the can opener or the mallet." After soiling himself, he would "either stand there and wait for [J.M.] or [the co-defendant] to show back home after work or from school, and then they would take care of it from there, or I would just stand there for a while and wait for [the defendant] to care about it."

A.M. also stated that he "was not allowed to eat," recalling that food was "a reward." "I was only fed once every four or five days. And I recall getting a tiny glass of water once every three days." Although the co-defendant participated in food deprivation, A.M. stated that it was at the defendant's direction. If the defendant was not home, the co-defendant did not punish him for getting food, but he knew that if he got food when the defendant was there, "the consequences would be icy bathtub, rolling pin and mallets." A.M. described the hunger he experienced as "painful," and "it feels like you're starving."

On one occasion, A.M. was handcuffed to a cabinet and repeatedly asked for a drink of water. The defendant refused him water until "[s]he finally came out and she said the only way I'm going to give you water is if you take these pills to kill yourself. So I said, fine, then. Give me the pills. I'm taking this water and I'll do it." A.M. swallowed the pills, but as it "turned out they were just like vitamin pills or something like that." A.M stated that during the periods of abuse, he would write letters to the defendant apologizing for his behavior, although "[m]ost of the time I wouldn't because I was handcuffed for the majority of the time." On one occasion, he "apologized for something and then they had unhandcuffed me and gave me something to drink." A.M. said that the longest period that he was handcuffed was "usually . . . for one straight week." He explained that he did not try to escape before May 28, 2013, because of fear: "I didn't know what would happen. I didn't know who I would go live with. I didn't know what to expect." He also stated that he was usually handcuffed to something in the house and "could not physically move . . . . And at that time, I just don't think I had the emotional willpower to do it either." By May 28, he "had drawn a . . . clear line, maybe. I wasn't going to take that anymore. I don't

-11-

believe [J.M.] wanted to take it anymore and it was finally time to get out."

A.M. stated that, while he was still living with the defendant, neither he nor J.M. were bigger than the defendant. He had been aware of the defendant's multiple sclerosis ("MS") diagnosis since 2005, but he did not notice the disease affecting her physical ability: "She was fully capable of doing anything she wanted to do." He denied that the co-defendant abused him without the defendant's involvement. The defendant, however, abused A.M. "[a]ll the time" when the co-defendant was not present. The defendant most often abused A.M. in the mornings, "hitting me, leaving me standing there, not feeding me, not letting me use the bathroom," and when A.M. did "something that made her angry during the span of the day, she would have [the co-defendant] deal with it after he got home from work."

During cross-examination, A.M. testified that he did not leave the house while the family was in Gatlinburg because he "was afraid. I didn't know what would happen. I didn't know where I would go." He also expected J.M. to try to stop him from leaving, stating, "It would have been very, very bad on [J.M.'s] behalf if they . . . showed back up and I was not there, but [J.M.] was." A.M. explained that at that time, J.M. lacked the motivation to leave because he had been promised "little rewards" and had remained in the defendant's good "graces up until the moment they came home." A.M. stated that the defendant was the only mother figure in the victims' lives. He acknowledged that he had told the defendant that he loved her and had given her Mother's Day cards, but he said that "it was just all an act" because "I wanted to be in her graces. I did not want to come home and have to face any kind of consequence. I wanted to . . . live a normal life." He stated that he wrote letters to the defendant because he believed that if he could give the impression that "I would've done whatever it was that she wanted me to do, I would have been . . . [in] her good graces." But if he "did something that she did not want me to do, I would be in some type of trouble. And I did not want to be in trouble." A.M. recalled several occasions on which he apologized while handcuffed; he apologized for lying, stealing food, and being manipulative.

A.M. recalled an occasion when the family went to a water park in Pigeon Forge in December of 2012. A.M.'s friend also went on that trip. A.M. acknowledged that he and his friend had a sexual encounter, which, he stated, caused trouble at home. As a result of that encounter, A.M. was withdrawn from FHS. A.M. acknowledged writing a letter to his friend in which he recognized that he had "'caused one of the few people I care about in this world to a level of suicide'" and that "'[t]o fix that situation is to talk with his parents, then with [the friend], and beg him to forgive me.'" A.M. denied that he had been bullied at school. He stated that the co-defendant removed him from school at the defendant's demand because "[s]he had told me that I was accused of raping [the friend]."

-12-

A.M. stated that he and J.M. moved some items out from under the kitchen cabinet in order to make room for J.M. to crawl through to facilitate their escape. He estimated that the defendant hit him up to five times with the rolling pin on the evening of May 27 while he and J.M. were handcuffed to an upper cabinet. He stated that his feet were "the primary place that she liked to hit me. . . . [S]he would use my feet against me, since I was standing on them for so long, a week straight, usually, and that they would just get so swollen and that it would just even hurt even more."

A.M. stated that when he was handcuffed for up to a week at a time, he would sleep in the handcuffed position; "I would do everything in that position. That's pretty much doing nothing, other than sitting or standing there." He acknowledged that he told staff at Children's Hospital that he had been forced to eat cockroaches, feces, and urine but that he did not disclose that to the police. He also acknowledged that he had told hospital staff that he did not know how he sustained the injury to his penis, but he explained that he felt "embarrassed" and "did not want somebody seeing that particular part of my body." A.M. stated that when the defendant burned his penis, he was handcuffed to a kitchen cabinet with his hands above his head, and the defendant pulled down his boxer shorts and burned him with a cigarette, holding it to him until the cigarette went out, causing "[e]xcruciating" pain.

A.M. said that the doctors at Children's Hospital were concerned that the handcuffs had caused nerve damage because he had lost feeling in a finger four or five months prior and could not "hold things normally or use my hand appropriately." He stated that he had been hit in the head with the can opener on multiple occasions but clarified that he was not hit with it on the night of May 27. A.M. acknowledged that T.C. had inflicted many bruises on him "throughout my entire childhood," but he could not recall whether any of the bruises he had at the time of his escape had been caused by T.C., other than a red mark on his face from where T.C. had hit him. A.M. stated that he and J.M. were in the same hospital room during most of their stay at Children's Hospital.

A.M. explained that he did not fight back against the defendant when she submerged him in the bathtub because his hands were handcuffed behind his back, and "I was stripped naked or I only had my boxers on during that time." The defendant "had thrown me in the bathtub, essentially, and used a good . . . portion of her body strength or her sheer body to submerge me into the water. My face was down in the water. I could not breathe. I honestly thought I was drowning." The co-defendant was present during one bathtub incident, but "he did not participate" or interfere. A.M. estimated that he was five feet and seven inches tall during January to May of 2013. He reiterated that he was afraid of the defendant and had "seen [her] move things that are twice her size, that are heavier than she is. . . . She also had my father . . . who [wa]s twice the size of me." He had also grown up with the defendant as his mother figure, living with her since "around

-13-

2002 or 2003," which also made him hesitant to fight her.

A.M. stated that although the worst period of abuse was from January to May of 2013, the victims "were accustom[ed] to a life of beatings, a life of torture," and a life of atrocities "that no child should have to face." A.M. acknowledged that, after the defendant's arrest in this case, he posted on his Twitter account about playing a game of "'psychological torment'" in which "'[t]he one who commits suicide first obviously loses.'" A.M. explained that the post was "in quotes, meaning I did not say it. Means I found it someplace else and I just wrote it down." A.M. also stated that for the first year and a half after his escape there were "a lot of things I had to figure out who I was in life and figure out where my place was." He explained another Twitter posting about J.M.'s getting "'more in the long run'" to mean that he assumed he would move out of his grandparents' house before J.M. did and, therefore, J.M. would get more material belongings than him.

A.M. acknowledged that despite the co-defendant's threatening to send him to military school, he was pursuing a career in the military, explaining that because he could not afford to attend college or flight school, he had determined that "the Air Force was the best option to go to." A.M. also acknowledged that, at times, he had been jealous of his step siblings because "[t]hey got a whole lot of nice things and . . . me or [J.M.] did not. They got to do whatever it is they wanted to do. For the most part, me and [J.M.] did not." He stated that, "[f]or the most part," the co-defendant treated the defendant well, and A.M. "just got accustom to" his father's loving the defendant more than him, and, although he "accepted that fact," he acknowledged that he wanted the co-defendant to love him. He stated that on several occasions prior to 2010, the police were called to the house because of fights between the co-defendant and defendant.

On redirect examination, A.M. testified that in his conversations with Mr. Huff, Ms. Owsley, and Officer Sharp at FHS, he provided "just enough information to let them know what they needed to know" to "get me out of the situation." At Children's Hospital, A.M. spoke with Detectives Tonia McFarland and David Wise, CPS agents, and nurses, but the investigation at that point involved "[j]ust preliminary things." On May 31, A.M. gave a several-hours long interview at Child Help USA, detailing the abuse.

A.M. recalled telling the hospital staff that he was not fed regularly and "had to monitor what I ate" to avoid getting "very sick." He stated that the house was "full of cockroaches," and because the defendant would go through the trash to look for evidence of A.M.'s sneaking food, he had to hide the trash of the food he ate. The defendant blamed A.M. for the cockroaches in the house and "would sometimes kill them or sometimes just catch them and make me eat them." Once, the defendant caught A.M. sneaking a coffee drink from the refrigerator, and the defendant urinated in the drink "and said that's the only

way I was allowed to drink it from there." On another occasion, after A.M. had defecated on himself, the defendant "was so angry that she smeared it on my face and into my mouth as well."

A.M. described one form of punishment that both the defendant and co-defendant employed that required him to hold a "normal-size" can of food in each hand and hold his arms out. If he lowered his arms or "if they started to drop," the defendant and co-defendant would "whip you with a belt or hit you or do something." A.M. stated that this form of punishment was the defendant's idea, and when the co-defendant forced him to do it, it was at the defendant's direction. A.M. had been punished this way "for a very, very long time," and "[i]t was very painful."

Although A.M. never tried to break through the wood of the kitchen cabinets while handcuffed to them, he speculated that "there are probably many handcuff marks" on the wood because the chain would scrape against it if he pulled when the defendant "would hit me sometimes or I would move around." A.M. stated that his sexual encounter with the friend was consensual.

J.M., who was born in 1999, testified that when the defendant, co-defendant, and T.C. went to Gatlinburg in May of 2013, he had to stay behind to watch A.M. because A.M. "was supposed to be handcuffed to a kitchen cabinet." The defendant and co-defendant told him to watch A.M. "to make sure that [A.M.] was to be left handcuffed to the kitchen cabinet and that -- not to uncuff him and that to make sure that he would stay there." J.M. stated that he unhandcuffed A.M. using the handcuff key that "was usually kept on the soccer trophy in [the master] bedroom" "because, I mean, my brother's my brother and I felt sorry for him . . . because I've been in that predicament and I know how it feels." Later that day, either the co-defendant or defendant called the house, and J.M. told them that A.M. was still handcuffed to the cabinet. J.M. said that when A.C. arrived at the house and discovered that A.M. had been handcuffed, "she was very upset and scared because she didn't know . . . what to do, because A.C. had never really been there when, like, things like this had happened." A.M. remained unhandcuffed until the family returned home the next day.

J.M. stated that the defendant first discovered that A.M. was unhandcuffed while the co-defendant and T.C. "had gone to Sonic," and both victims were in trouble at that point. When the co-defendant returned home, the defendant was "angry" and told him, "[Y]ou need to cuff your boys," and the co-defendant handcuffed the victims to an upper cabinet, each with one arm above their heads, which J.M. said was painful. The defendant and co-defendant argued "over the course of the night," and the defendant talked to A.C. on the phone. Later that night, the defendant asked the co-defendant to move the victims to a lower cabinet, and the co-defendant complied, handcuffing J.M. by his left hand and

A.M. by his right hand with both victims facing away from the cabinet. That night, the victims "talked about trying to run away," and they determined to "figure out a way how to get out" after the defendant and co-defendant fell asleep.

When everyone else in the house was asleep, the victims "switched places somehow." J.M. could not recall how they switched positions, but he stated that they were not unhandcuffed at any point, but J.M. "somehow got [to] . . . where [A.M.] was sitting and [A.M.] got to where I was sitting," and both victims were facing the cabinet. They "had quietly taken all the Tupperware out of the cabinet" to make room for J.M. to crawl through. J.M. stated that it took him two or three minutes to crawl through because it was difficult to do so quietly. They then went to the front bedroom, moved several items out of the way of a window, and climbed out.

Using a solar powered light from a neighbor's yard, the victims walked to Kroger, where they put several food items in their pockets. J.M. stated that they "went up to a person at one of the registers and we asked if we could use their cell phone," but the employee declined "because it was a company phone, that we weren't allowed to use it." The victims then walked to Krispy Kreme, but J.M. stated that they did not see anyone there. They walked to the drive-thru window at a McDonald's at approximately 5:00 a.m., and an employee came outside and allowed A.M. to use his cellular telephone to call their grandparents. J.M. recalled that they then walked to FHS, where they ate the food they had taken from Kroger.

When Mr. Huff arrived on campus, he talked to the victims and called the police. Officer Sharp arrived a few minutes later and removed the victims' handcuffs. J.M. stated that he was scared when the police got involved because "I didn't really know who I could trust." The victims were transported to Children's Hospital by ambulance. J.M. stated that he had painful injuries to his wrist from the handcuffs., and A.M.'s injuries included "an open wound" on his right foot, "a burn under his chin[,] and some bruises around his wrist as well." A.M. was limping from the injury to his feet, which, J.M. said, the defendant caused by using "a rubber mallet, a wooden rolling pin or her feet and she would pound it on his feet" while A.M. was handcuffed to a cabinet. J.M. stated that A.M. also had injuries to his knees from being forced to kneel on rice. On one occasion, J.M. saw A.M. with his hands handcuffed behind his back in the master bedroom with "two bags of unopened rice . . . under his knees." The defendant later took A.M. to the bathroom and burned his chin with an incense stick. On another occasion, J.M. saw the defendant force A.M. to kneel on rice in the kitchen while his hands were handcuffed behind his back.

J.M. also described an incident in which the defendant forced him to fill the bathtub with cold water and ice cubes, and the defendant took A.M. into the bathroom, made him undress, handcuffed his hands behind his back, and forced him facedown into

the bathtub "put[ting] his head underwater." J.M. saw the defendant then "forcefully get on top of him to keep him in the tub." A.M. "was flailing around, trying to get out of under the water," and J.M. warned the defendant that she had knocked several razors into the tub. The defendant then got out of the tub and took what J.M. believed to be shower gel and squirted it into A.M.'s eyes. J.M. also saw the defendant take a butt of a cigarette and burn the tip of A.M.'s penis with it. The defendant then told J.M. to get thick, heavy clothing for A.M. J.M. explained that the house did not have central air conditioning, and when the weather was warm, "as a punishment, [the defendant] would make us wear hot clothes to make us burn." The defendant had forced J.M. to wear heavy clothing as a punishment once or twice.

J.M. described an incident in 2012 in which he defecated into a floor vent while handcuffed to the oven because "I really had to go to the bathroom . . . [a]nd since - - since the heating and air wasn't in use, the vents were never actually used." Over the next few days, the stench spread throughout the house, and when the defendant discovered what had happened, she "filled up the bathtub and tried to drown me in it." J.M. stated that he had been wearing "an adult diaper" at the time "because I wasn't allowed to leave where I was and I would have . . . to use the bathroom on myself." But, because he found it uncomfortable to use the diaper, he used the floor vent instead. When the defendant forced J.M. into the bathtub, his hands were handcuffed behind his back, and the defendant held him facedown underwater. J.M. stated that he struggled against the defendant and managed to turn face up and use his hands to remove the plug from the drain. J.M. estimated that at the time the defendant held him underwater, he was approximately the same size as he was at the time of his escape.

J.M. testified that the victims had been punished for stealing food. In one such punishment, both the defendant and co-defendant would force the victims to hold cans of food "out to our sides" for one to three hours at a time, which J.M. said was painful. J.M. stated that although the defendant, co-defendant, and T.C. were free to get food whenever they wanted, the victims were not permitted to do so, and the defendant told them that they were "not allowed to go near the refrigerator." He said, "There were just times where [the defendant] wouldn't allow us to eat . . . and so we weren't allowed to eat any food in this house unless . . . give[n] to us." Because of the food deprivation, the victims would sneak food and "take things that weren't very obvious." J.M. stated that on one occasion, the defendant hit him on the top of his head with a rolling pin because he had given A.M. a couple of crackers before leaving for school while A.M. was handcuffed to a cabinet. When J.M. returned home from school, he denied giving A.M. the crackers, and the defendant hit J.M. with the rolling pin, causing him to bleed. The blood ran "all over the back of my head, down on my shirt." J.M. stated that on other occasions, the defendant and co-defendant hit him with belts and hangers, and he had seen A.M. being hit with "the rolling pin, the rubber mallet, belts, and things like that." Neither victim received medical

-17-

treatment for their injuries prior to their escape.

J.M. could not recall how many times he had been handcuffed, but he said that it was a "lot of times" and "[d]efinitely more than ten" times from January to May 2013. He estimated that A.M. was handcuffed approximately 30 times during that same period. Both the defendant and co-defendant handcuffed J.M., and "on a few occasions, they would make [A.M.] handcuff me." J.M. stated that the co-defendant would sometimes lock the handcuffs to prevent them from tightening on the wrist, but the defendant never locked them. He recalled being handcuffed once to a bunk bed, twice to the dishwasher, and on other occasions, to the oven and kitchen cabinets.

J.M. stated that he cared about the defendant "because I felt like she was my mom," and he acknowledged that he lied in a Facebook message to her after her arrest, explaining that he "missed her because she was like a mother figure that I felt sorry in some ways and that I was so young, I didn't realize what I was doing." J.M. explained that "when you're taken away from somebody so quickly, it's like your first instinct is somehow to get back to them, to be with them again." After further consideration of the matter, he "realized that's not what I wanted and I didn't want to be put back in that situation."

J.M. stated that he attended school until March of 2013. From January to May of 2013, the victims' grandparents would come to the house, but the defendant would not permit anyone to answer the door, and the family "would just try to be as quiet as possible." The only people who witnessed the handcuffing were the defendant, the codefendant, the victims, T.C., and A.C.

During cross-examination, J.M. acknowledged that he had previously described the victims as being handcuffed by his right hand and A.M.'s left hand on the night of their escape. He stated that when he had previously testified that the victims had moved "everything" out of the way in the front bedroom to access the window, he did not "literally . . . mean everything"; rather, he meant that "[w]e moved what we had to move in order to get out of the window."

J.M. said that he went to school "some days," estimating that he attended approximately "half the time" from January to May of 2013. He said that the family had food in the house and that he had the ability to get food but that he was not permitted to do so. He recalled one occasion in which he "had to clean [the dog's] cage with bleach, and I think I might have accidentally put too much in there and I think it might have accidentally killed him." He clarified that when the defendant had hit him in the head with the rolling pin for giving A.M. some crackers, he fell to the ground, and the defendant "probably hit me two other times" while he was down. J.M. stated that when the defendant burned A.M. with a cigarette, A.M. was in the bathtub.

-18-

J.M. stated that he and A.M. did not leave the house while the defendant and co-defendant were in Gatlinburg because "[i]t just didn't cross our mind at the time." He reiterated that at some point during the night before their escape, the victims switched places at the cabinet, but he denied that anyone moved them around. He estimated that they spent "no more than [10] minutes" inside of Kroger on the morning of May 28. He acknowledged that the victims hid the fact that they were handcuffed while in Kroger, explaining that he was scared. J.M. described his injuries from the night that he escaped as malnourishment and wounds to his wrists from the handcuffs. J.M. acknowledged that the co-defendant had abused him at times and had called him a liar and a thief "[f]rom time to time." He said that the co-defendant was stronger than the victims, and, although the co-defendant was physically stronger than the defendant, the defendant was stronger "[i]n some ways." J.M. estimated that he was five feet and nine inches tall and weighed 105 pounds at the time of his escape.

J.M. acknowledged that in a Facebook message, he apologized to the defendant, told her that he loved her, told her that it was A.M.'s idea to flee the house, and stated that he did not believe what people were saying about the defendant. He stated that he was close to the defendant "maybe in a way or two . . . but not fully." He acknowledged that the disparity of treatment between him and his step-siblings upset him because "I don't understand how you can treat two kids one way that aren't your own kids, but you can treat your kids better than you can treat other kids. I don't see how that's fair."

On redirect examination, J.M. recalled A.M.'s having his mouth taped with blue painter's tape on at least one occasion. He stated that his teachers were unable to see the bruises on his body because he "usually always wore jackets or long pants and things of that sort" at school. He clarified that when the defendant hit him with the rolling pin, causing him to fall to the ground, he covered his head, and the defendant then continued to hit him on the arms with the rolling pin.

The co-defendant testified that he and his first wife had four children together, including A.M. and J.M. They divorced in 2003. In 2002, he began a relationship with the defendant, who had three children, T.C., A.C., and A.P., and the defendant and her children moved in with him and his parents. The entire family moved to Knoxville in 2004, and in 2010, the defendant and co-defendant got married. The victims lived with the defendant and co-defendant full-time, and the defendant's children stayed with them periodically. The victims referred to the defendant as their mother.

The family moved to the residence on Canton Hollow Road in mid-2010, and the only people residing there on a full-time basis were the defendant, co-defendant, and the victims. T.C. and A.C. lived there on a part-time basis, including the weekends,

holidays, and school breaks. A.P. would visit the family, but she did not spend the night. The co-defendant stated that he and the defendant slept in the master bedroom of the house while the children "would either sleep in the living room or . . . the front room." The third bedroom was used primarily for storage but was also where A.C. slept when she stayed the night. He explained that the children often slept in the living room "because of the heating and cooling of the house."

The co-defendant worked at Mr. Handyman in Knoxville as "a home improvement modeling technician," working a minimum of 40 hours per week and "most times substantially more." He ordinarily worked weekdays, leaving the house at 7:30 a.m. and returning home between 5:00 p.m. and 7:00 p.m. The defendant was not employed. The co-defendant described his relationship with the defendant as "strained," and he feared "that at any moment that it would end, that she would . . . leave." He attributed much of the strain to her abuse of the victims "and how they were being treated in the house." He acknowledged that from January to May 2013, he drank "almost every day when I got home from work," "[u]p to half a fifth of vodka a day," passing out from the drinking on a regular basis. He would also "[o]ccasionally" take pills, including hydrocodone and Roxicodone, only some of which were prescribed to him.

The co-defendant stated that he loved the defendant "more than anything in the world," and his fear that the defendant would leave him made him feel "[s]cared, afraid, desperate, [and] helpless." Their arguments consisted of "[m]ostly yelling and shouting," but "there were occasions where she got aggressive with me, where she would push -- push me or get in my face and verbally yell at me." He acknowledged that he was bigger than the defendant and that he might have pushed her on one occasion, but he denied that he ever threatened her. He stated that most of their arguments were "about the children. She would get very upset at [A.M.] and [J.M.] for any number of things and demand that something be done with them, that they be disciplined in a specific way."

The co-defendant stated that in January 2013, things "got worse" because the defendant "got much more upset with [A.M.], in particular" after the family took a trip to Wilderness of the Smokies. He stated that he took A.M. out of school in part because the defendant wanted him to and in part because "it was reported to us that [A.M.] was having some problems in school from some things . . . from the trip." The defendant was the one who "made the decision to take [A.M.] out of school," but the co-defendant acknowledged that he signed the paperwork, explaining that he "wanted to do anything I could do to . . . appease her and keep her happy." He planned for A.M. to complete the school year through a "home-schooling program," but the educational responsibilities "mostly would have fell on" the defendant, and she did not continue A.M.'s schooling after he was removed from FHS despite her being home with A.M. during the weekdays.

The co-defendant described numerous instances of abuse. A.M. "was being handcuffed to the cabinets in the kitchen for extended period of times, either by [the defendant] or at her request." A.M. would be handcuffed from morning until night and overnight. J.M. was handcuffed "a few times," but the defendant's "primary focus was on [A.M.]." On one occasion, A.M. "was physically being disciplined," and the defendant was hitting him "with objects in the legs" and then "stomped on his foot." On another occasion, the co-defendant came home from work and found A.M. in the master bedroom "on his knees in front of the closet," "kneeling on dried rice," and "his hands were in handcuffs behind his back. [The defendant] was yelling at him about, stop moving or swaying." J.M. "was lighting an incense stick," and the defendant "leaned forward, grabbed the incense stick from [J.M.], she touched [A.M.] under his chin with it and burnt him. [A.M.], of course, yelped. I imagine it was quite painful."

In a second incident involving rice, the defendant was angry with A.M., and the defendant told the co-defendant to have A.M. "kneel down on the rice." J.M. had handcuffed A.M. at the defendant's direction, and the co-defendant put a "little half handful" of rice down on the floor of the master bedroom. A.M. knelt on the rice for 45 minutes to one hour on that occasion. The co-defendant maintained that although he placed the rice on the floor and did not object to the form of punishment, it was the defendant's idea. In a third incident, the co-defendant returned home from work and found that A.M. "had been kneeling on rice for some time."

Once, A.M. "was handcuffed in the kitchen with his hands up behind his -- behind his back on a -- like an elevated cabinet, with his hands in between two doors to the cabinet." The defendant "walked by, she yelled at him 'I just want you to die.' She then took her foot and she stomped on top of his foot." A day or two after the defendant stomped on A.M.'s bare foot, A.M. developed what looked "like a big water blister" on the top of his foot. The co-defendant drained the blister with a needle and a couple of days later treated it with Neosporin and bandaged it. He acknowledged that he did not seek medical treatment for A.M.'s foot even though "that was probably the right thing to do," explaining that he "didn't want the situation getting out. I knew that if something like this went to a doctor, then a doctor would obviously have questions." Although the co-defendant did not witness any other abuse to A.M.'s feet, the defendant told him that "[s]he had hit the top of his foot with an object. I believe it was the . . . wooden rod from the paper towel holder."

The co-defendant stated that there was "another incident where, again, [A.M.] was handcuffed in the -- in the kitchen . . . with his hands back behind him. He was standing up." The defendant hit A.M. "repeatedly" with the wooden rod, "five or six times, very hard on his thighs." The co-defendant described another incident in which the defendant hit A.M. on "the top of the head" with the wooden rod while A.M. was handcuffed to a cabinet. On another occasion, the co-defendant saw injuries on A.M.'s

-21-

head, including "a knot . . . [and] small cut that bled," and the co-defendant put a rag on the injury to stop the bleeding.

In another incident, the co-defendant returned home from work and found the victims "scrubbing the floors and they were wearing their -- it was warm outside and they were wearing sweat suits." The defendant told him that she wanted to make it hotter and more uncomfortable for the victims "so they'll do it right." The victims' chores included taking care of the pets and doing "all the cleaning, . . . sweep the floors, mop the floors, clean the countertops," and if the defendant determined that the victims had done a less-than-adequate job of cleaning, she would punish them. The defendant had hit A.M. and J.M. with a brown, leather belt, hitting "them in the back, in the buttocks, [and] in the legs." The defendant had also hit J.M. with a belt "that had jewels, like, sequins."

The co-defendant described an incident when the defendant held A.M. underwater in the bathtub. He came home from work to find the defendant and the victims in the master bedroom, and the defendant appeared upset. After having A.M. strip "down to his underwear," the defendant ordered J.M. to handcuff A.M.'s hands behind his back. She then "marched [A.M.] over to the bathtub" and "started to yell at him."

> . . . And then out of nowhere, she just shoved him and he toppled directly into the bathtub. She climbed into the bathtub. She grabbed him around the ankle area of his feet, and he's laying in -- with his back -- on his back with his hands cuffed behind his back and she pulled his feet up to where his head went underwater. And then she let him back and then did it again, and he was, you know, of course, flailing and everything.

The co-defendant stated that he did not intervene because "I was stunned. I was shocked. I was frozen at what was happening. I just couldn't -- I couldn't move. . . . And I didn't want to -- part of me didn't want to defy her."

The co-defendant stated that there was plenty of food in the house and that all of the children had to ask if they wanted something to eat or drink. But, he acknowledged that there were "plenty of times" that food was withheld from the victims as a form of punishment if they "didn't follow the rules that [the defendant] had laid out that day or didn't complete a task, like cleaning the living room . . . to her standard that she had." The defendant "would say that, you know, they're not going to eat dinner or they're not going to eat today." The co-defendant "would go along with that," and he acknowledged that the victims would go "[s]ometimes a day, at least" without food.

-22-

The co-defendant described the events of Memorial Day weekend of 2013. He, the defendant, and T.C. went to Gatlinburg, and the victims remained at home with A.M. handcuffed in a seated position to a kitchen cabinet. The defendant handcuffed A.M. on that occasion, and A.M. was in that position for "at least several hours" before the family left for Gatlinburg and was to remain in that position until the family returned home. The defendant also "applied blue painter's tape around to make it so [A.M.] couldn't see and then over his mouth so that he couldn't -- you know, he wouldn't make noise or talk to the other kids." The co-defendant acknowledged that he had placed tape over A.M.'s eyes at the defendant's direction on other occasions because the defendant "was concerned that he was watching TV out of the corner of his eyes" while he was handcuffed in the kitchen. A.M. was fed hotdogs and macaroni and cheese before the family left for Gatlinburg. The co-defendant stated that neither he nor the defendant were concerned about A.C.'s seeing A.M. in the handcuffed position because she "had seen him like that before."

Although the co-defendant "had concerns" about leaving A.M. handcuffed while they were in Gatlinburg, he "didn't say anything" because he "didn't want to anger [the defendant]." When they returned home at approximately 10:00 a.m. the next day, A.M. was in the same handcuffed position as when they left. At approximately 4:00 p.m. that day, the co-defendant, defendant, and T.C. went out to dinner, and J.M. and A.M. remained at home with A.M. still in the seated position in the kitchen. On the way home, they stopped at Sonic to pick up food for J.M., but they did not get any food for A.M. because, the co-defendant explained, he was not permitted to have food that day. After they arrived back home, the defendant talked to A.C. on the phone, and "it had come to light that [A.M.] had been let out at the time that we were gone." When the co-defendant checked on A.M., he found that he was no longer handcuffed and was just sitting with his hands behind his back. At that point, the defendant "wanted them both handcuffed through the cabinet together," and the co-defendant handcuffed the victims in a seated position with each victim having one arm through the "center portion of the cabinet." The defendant, however, "did not like the way that [the victims] were placed" because she believed that they may be able to get out, and the defendant moved them so that "they were kind of back-to-back in there." Neither J.M. nor A.M. were fed that evening.

The next morning, the co-defendant discovered that the victims were no longer in the house, and he and the defendant "drove through the neighborhood" and to Kroger but did not find them. The co-defendant then returned to the house while the defendant continued to drive around and look for the victims. While the defendant was gone, several police officers came to the house, handcuffed the co-defendant, and searched the house. The officers then had the co-defendant call the defendant and ask her to come home to speak with the officers. He stated that, at first, he thought the police "were doing a drug raid or something and that they just got the wrong house," but then the officers told him that they had found the victims.

The defendant was arrested that day and returned home that evening after posting bail. A few days later, the defendant wanted to get rid of certain items, including the "shampoo bottles, the jewels . . . that had fallen off the belt, that belt with the jewels on it, another belt, some of the blue tape, . . . anything that was involved in dealing with [A.M.] and [J.M.], you know, a few odds and ends." The defendant put those items in the garbage, and the co-defendant placed the garbage bags outside of the house.

The co-defendant acknowledged that in the photographs of the victims taken on May 28, A.M. appeared malnourished. He stated that he had shaved A.M.'s head at the defendant's direction as a form of punishment because A.M. "like[s] his hair to be kind of long, I guess like the Justin Bieber style or whatever." He acknowledged that he may have caused one of the bruises on A.M.'s back when he "spanked him with a belt," but he denied causing any other of the victims' injuries. He stated that in addition to the kitchen cabinets, the victims had also been handcuffed to the stove on several occasions.

The co-defendant stated that, because the defendant did not want A.M. to pick at the injuries on his wrists caused by the handcuffs, they would tape a sock over his hands "to keep him from using his fingers to pick at any scabs or anything." He said that the defendant stomped on A.M.'s foot, causing a blister-like injury within five days of the victims' escape. Instead of seeking medical treatment for A.M.'s foot injury, the defendant "would have him sit down more" as "the way that she wanted it dealt with."

The co-defendant acknowledged that he had not been truthful in previous statements to the police, explaining, "I was attempting to protect [the defendant]. I was trying to hide the fact of the things that happened and transpired at our house." He acknowledged that he discussed his testimony for the preliminary hearing with the defendant, explaining, "She wanted it made clear that I would do everything I could to protect her and that something had to be said about the marks that were on [A.M.'s] wrists with the handcuffs." They determined that the co-defendant could "shut this whole thing down" by claiming that he was the only one who had handcuffed the victims. The co-defendant stated that his prior testimony that the defendant "never did anything to [the victims], never spoke ill to them, never raised a hand at them, never had anything to do with any of their discipline" was a "100 percent" lie.

The co-defendant stated that he decided to tell the truth because he "had really fallen short with my kids . . . . And the biggest thing that I could do to show them how important that they were to me . . . was that I could step forward and at least show them now that I was going to stand and tell the truth." He acknowledged that he pleaded guilty "to a variety of charges" and was awaiting sentencing at the time of the defendant's trial, and he hoped that by testifying at the defendant's trial, the court would consider his

-24-

cooperation and contrition and would "mitigate or me[te] out a fair and just punishment." He denied that the State had made any promises to him regarding his case or sentence and denied that his primary objective in testifying was to seek leniency for himself.

During cross-examination, the co-defendant acknowledged that he was a former police officer and that he had been trained in how to restrain people and protect himself but claimed that he, nonetheless, allowed the defendant to abuse his children. He also acknowledged threatening the defendant on several occasions and pushing her on one occasion. He was aware of the defendant's "reciprocating recurring MS" diagnosis and that "[s]he took medicine for all kinds of things."

He stated that the victims never struggled against the handcuffs, and he "never observed them pulling or anything." They "did everything they could to appease [the defendant,] and they knew that to challenge or defy her in any way would be met with substantial punishment." He acknowledged allowing the victims to be handcuffed for hours at a time "[i]f not longer." He also acknowledged that he failed to intervene when he saw the defendant's submerging A.M. underwater, but he reiterated that he was in shock and denial and did "not want[] her to think that I wasn't on her side." The defendant "had preached, over the years," to him about presenting a "unified front" as parents and not wanting him to "step in her way" because she was the one at home with the children. He stated that he "wanted her to feel like she was in charge."

The co-defendant stated that he "was concerned about" A.M.'s sexual encounter with the friend during the trip to Wilderness of the Smokies, but he denied being upset about it. He acknowledged that A.M.'s encounter with the friend played into his removing A.M. from school in March of 2013, but he maintained that the primary reason for A.M.'s removal was because the defendant "ordered me to take him out of school." He stated that he paid the fee and enrolled A.M. in the homeschool program, and he acknowledged that it was his responsibility as A.M.'s father to ensure that he was educated and fed.

The co-defendant said that he confronted the defendant about her treatment of the children, and at times, the defendant would agree to stop the abusive treatment. At some point, he told the defendant that he did not want her to discipline the victims, but he did not intervene when the abuse continued.

When the family was preparing to go to Gatlinburg on May 26, 2013, they did not discuss whether the victims would also come on the trip. Although the co-defendant "wished my boys could do everything with me," he "knew that [A.M.] certainly couldn't come" and that "it was probably best that they stay." The co-defendant believed that the victims were jealous of the defendant's children because her children "100 percent had her

love and attention and affection and [the victims] did not have it so much." Although the co-defendant favored the defendant over the victims, he said that the victims "never appeared jealous of her."

The co-defendant explained that he threatened to send the victims to military school because the defendant was angry that A.M. had been released from the handcuffs and permitted to "do whatever he wanted to do" while they were gone and that "the boys lied about that happening." The co-defendant stated that he "never, once, in the course of all this, ever just handcuffed . . . them because I thought it was the thing to do. It was always because of what [the defendant] said."

He acknowledged that, at the preliminary hearing, he testified that the defendant did not believe in corporal punishment and that A.M. was a difficult child, explaining that he said those things to "paint[] the picture that [A.M.] and [J.M.] were difficult children that required an extraordinary amount of time and effort and were just ultimately very difficult to deal with and would do anything." He reiterated that he lied in his testimony at the preliminary hearing.

KCSO Sergeant McKenzie Alleman responded to Canton Hollow Road on May 28, 2013, at 9:21 a.m. Upon arrival, she did "just a quick walk-through just to see the condition of the residence." She then photographed the residence, beginning with the exterior and moving through the entire house. She noticed "some scratching, some damage and defect to the edges of th[e] center support" of a kitchen cabinet that contained Tupperware; the lower shelf of that cabinet was empty. The cabinet under the sink contained several items, including "a wooden-handled, rubber mallet" and a hammer. Sergeant Alleman stated that there was food in the house at that time. The front bedroom of the house had a bay window, the blinds of which had been damaged. She and other officers collected items that were of particular interest to the detectives, including "wooden incense holders and two sticks of incense" and a handcuff key found on a soccer trophy in the master bedroom.

During cross-examination, Sergeant Alleman testified that when she first arrived at the scene, she did not know the particulars of the allegations in this case. After completing the initial photographs of the house, she learned that the victims escaped through the window of the front bedroom, and she took additional photographs showing the escape route. She also found "smudges" on the interior and exterior of that window and lifted a latent fingerprint from the interior of the center pane. In the front bedroom, a window air conditioning unit was sitting in front of the window behind the dresser.

KCSO Officer Nathan Stansberry testified that he responded to Children's Hospital on May 28, 2013, where he photographed the victims. He described the victims

as quiet and "pretty thin." The next day, he returned to the hospital and took additional photographs "for follow-up purposes, to check for bruise progression and that sort of thing." He photographed the Canton Hollow residence on June 4, 2013, during the execution of a search warrant. He noted that the bathtub drain was "toward the center of the tub." During cross-examination, he testified that the victims were in the same room at the hospital, and a detective and another male forensic services officer were also present.

Former KCSO forensic services technician Trina Gregory testified that she responded to the Canton Hollow residence on June 4, 2013, to assist in the execution of a search warrant. During that search, she video recorded a walk-through of the entire residence and photographed evidence collected by the detectives. She also measured the kitchen cabinets, noting that the lower cabinets were "approximately two-foot-eleven inches" high and that the lower edge of the upper cabinet was "approximately four-foot-nine-and-a-half inches" off of the floor. The shelf of the lower cabinet was approximately 11.5 inches deep, and the lowest shelf was approximately 6.5 inches off of the floor with 10 inches between the shelves.

Some of the kitchen cabinets had "indentations" on the front of them, and the center post of at least one cabinet had damage that "appear[ed] to be a scrape mark or a scratch mark, and then some minor indentations on the sides." She noted that one of the lower cabinets had everything removed from it, and another cabinet had "Tupperware and plastic dishes . . . shoved over in the corner." Among the evidence she photographed was "a paper towel holder with the wooden dowel located on the kitchen shelf," a bag of belts, a roll of blue painter's tape, and a jar with two can openers.

During cross-examination, she stated that she photographed items at the request of the detectives. She said that the hands of someone handcuffed to an upper cabinet would have been approximately five feet and two inches off of the ground.

KCSO Lieutenant Gabe Mullinax testified that he collected security video footage from a Sonic restaurant that showed the defendant at the restaurant at 8:29 p.m. on May 27, 2013. He collected four recordings from Kroger's security cameras showing the victims entering the store at 4:41 a.m., exiting at 4:55 a.m., and exiting again at 5:35 a.m. on May 28. In one video, the victims can be seen eating fudge and taking a protein bar. Another video showed the victims, handcuffed together, talking to a cashier. In searching the co-defendant's work vehicle on May 31, Lieutenant Mullinax found blue painter's tape. He also assisted in the execution of the search warrant of the residence on June 4, where he collected a trash bag from outside of the house, containing blue painter's tape and a sock.

During cross-examination, Lieutenant Mullinax testified that the search of

the co-defendant's work vehicle occurred at the Mr. Handyman business and not at the residence. Other than property receipts for the items of evidence he collected, Lieutenant Mullinax did not write any reports in this case.

The co-defendant's father testified that he first met the defendant in the 1980s in Fort Wayne, Indiana, where the defendant and co-defendant attended the same school. The defendant and co-defendant began a romantic relationship in 2002 when the victims were approximately six and two years old, and the defendant took on the role of the victims' mother. At approximately 7:00 a.m. on May 28, 2013, while he was at work, his wife notified him that the victims were missing. At that time, he had not seen the victims since late 2012, despite his many efforts to call and visit the family. Later that same morning, he received a call from DCS informing him that the victims were in their custody. He and his wife met with DCS representatives at Children's Hospital, and they were cautioned about the victims' conditions. The co-defendant's father stated that when he first saw the victims, they did not look like the same children that he had seen six months prior, noting, "They had lost weight. They were greyish or whiteish, and yet, they were -- they were full of joy to see us." The victims lived with the co-defendant's parents after their release from Children's Hospital, and the co-defendant's father stated that the victims "were so happy to be able to get some food that they almost hoarded it."

The co-defendant's father described J.M.'s recovery: "[H]e was not physically as harmed -- we didn't see the visual effects on him, but emotionally, I think he was damaged more than [A.M.] was, because . . . he had a lot of emotional ups and downs." J.M. continued to see a therapist and take medication, and, as of the time of trial, his emotional outbursts had greatly reduced from once per week to "one in the past four or five months." Mr. McIntosh estimated that J.M.'s weight had doubled since the time of his escape.

The co-defendant's father was more concerned with A.M.'s physical injuries, noting, "He had some scars on his foot." He stated that A.M. also suffered from paranoia that "somebody was going to come and take him away and get him. He would not sleep anyplace but in our room. And he made sure the doors were locked at night and we were all safe and sound and tucked in." The co-defendant's father estimated that A.M. had also doubled in weight since the time of his escape. Despite A.M.'s being "very far behind in school," he "worked very hard" and graduated on time.

Doctor Marymer Patricia Perales testified as an expert in child abuse medicine. She treated the victims at Children's Hospital on May 28, 2013, as the child abuse pediatrician. She described the victims as "two young men who were sad, skinny and dirty." She did a "full assessment" of each victim, noting that J.M., who was 14 years old at the time, "had markings around his wrists. And he gave me a history very concerning

-28-

for chronic concerns for abuse and neglect." She stated that J.M. was five feet and three inches tall and weighed approximately 105 pounds. A.M. also had numerous "markings on his body, his legs; he was swollen; he was -- his affect or the way he kind of sits and looks at you was very sad, very blunted; he was also dirty . . . ." Doctor Perales was concerned about the history of abuse and neglect that A.M. described to her, noting that "his lab work [was] abnormal and consistent with that" history.

By the time Doctor Perales had assessed the victims, they had already talked to the EMS team, the emergency room physician, the admitting team, and the general pediatric team about their conditions. J.M. told Doctor Perales that A.M. had been the primary target of the abuse since January of that year "until about two weeks prior . . . , when [J.M.] began to help his brother by giving him food and helping him out." J.M. reported that he "had been punished" for the two weeks leading up to the victims' arrival at Children's Hospital. J.M.'s right wrist had "red marks" that "had, like, a little bit of an abrasive quality if you touch them -- to it that kind of go all the way around the wrist." He also had "another little area of redness" on the "little bone that sticks out" of the wrist. These marks, Doctor Perales explained, were consistent with J.M.'s account of being handcuffed to A.M. J.M. also reported that he was denied food at home as a punishment for helping A.M., but because J.M. was still attending school, Doctor Perales knew "that he at least g[o]t one good meal a day." Doctor Perales noted that both victims "appeared to be thin," which was consistent with their being denied food.

A.M. was 16 years old at the time and was five feet and five inches tall, weighing approximately 120 pounds. Doctor Perales noted that A.M. lost approximately two pounds of water weight in his first 24 hours in the hospital as the swelling in his legs reduced. She stated that malnutrition caused A.M. "to have low protein," and "when you have low protein in your blood, then your water goes elsewhere." The combination of his low protein and "having to stand for long periods of time" caused the swelling in his legs. Doctor Perales stated that A.M.'s color was off, and "his affect, his demeanor, [was] just very flat." A.M. told Doctor Perales that "he was denied baths, he was denied bathrooms, and because he was so dirty, . . . his parents shaved his head." A.M. had also described "being withheld food since about January of that year," being forced "to eat his own poop and to eat cockroaches that were in the home." A.M.'s blood tests indicated that he had "anemia, low hemoglobin, and low protein and low albumin," which Doctor Perales explained, "is a marker for malnutrition."

The injury to A.M.'s left wrist went "all the way around the wrist," and the skin had begun "to show callus from chronic irritation," which Doctor Perales said was "consistent with being handcuffed since around January." She stated that the callus would not have developed with sporadic handcuffing for brief periods of time; rather, it would have developed over "a prolonged period of time." A.M. had several lesions on his wrists

that were in various states of healing; some were "a little bit more raw," while others "had more scab" to them. He also had areas "of thickened skin and healing." Doctor Perales noted that the injuries to A.M.'s wrists "would be very irritating and painful at the times that movement would occur." A.M. also had an injury to his left index finger that was swollen to the point that he could not fully straighten it. An orthopedic physician diagnosed the finger injury as "nerve damage due to trauma."

Doctor Perales stated that A.M.'s right foot was "quite swollen" with a "lesion . . . in the middle . . . that ha[d] a little bit of a scab starting." She noted that the wound was "trying to heal," but the swelling in the foot was preventing blood flow and slowing down the healing. Doctor Perales stated that A.M.'s legs were swollen to the point of losing any definition between his thighs and ankles: "[H]is ankles are almost the same size as his thigh. I mean, it just look[ed] like one big trunk leg." "You can't see the definition of his calf." His feet were so swollen that "his toes can't even come together."

Doctor Perales described injuries to A.M.'s knees with "areas that I felt had some texture to it," with scabbing and discoloration, which injuries were consistent with his kneeling on dry rice. A.M. also had bruises and abrasions on various parts of his body, including his back, sides, arms, and legs. Doctor Perales stated that the injury to A.M.'s chin was consistent with his being burned with an incense stick and that the injury to his penis was consistent with having been burned by a cigarette. Doctor Perales noted five injuries to the back of A.M.'s head with hair loss, scabbing, and scarring, indicating to her that A.M. had been hit with an object. A.M. reported to Doctor Perales that his "injuries were mostly caused by his stepmother."

During cross-examination, Doctor Perales explained that, although the victims were kept in the same hospital room, she interviewed them separately in order "to get the most accurate history from them that you can." She acknowledged that A.M. reported having "eaten two hot dogs a day previous and nothing the day previous to that," but she explained that that was "certainly . . . not what a 16-and-a-half-year-old boy needs and not the most nutritious." She stated that being hit with a blunt object could cause a blister, and in A.M.'s case, although the injury to his foot could have been caused by another method, it was consistent with having been hit with an object. She noted that the victims' "history is very important," and A.M. had reported a history of being hit with a rolling pin or mallet, which story J.M. corroborated.

Although the scab on A.M.'s head was healing, Doctor Perales could not estimate a time frame of when that injury may have been inflicted. She noted that other injuries on A.M.'s head "were more healed." She acknowledged that A.M. reported a pain level of three to EMS, and that he "only really complained of pain when you palpated the back of his calf and when you touched directly onto his wound." She stated that she would

not have expected J.M. to be in significant pain from his injuries. Doctor Perales acknowledged that an injury "can be made worse by picking" at it.

The State rested, and the defendant elected to put on proof.

KCSO Detective Tonia McFarland, the lead detective in this case, testified that she was specially trained to investigate child abuse cases. In this case, she responded to Children's Hospital on May 28, 2013, where she briefly spoke with the victims while they were in the same room. She then separated the victims to interview them to avoid having them talk over each other and to ensure that each victim answered only the questions directed to him. She explained that it was common for multiple interviewees to "try to fill in any memory gaps or add to a conversation" when interviewed together.

After leaving Children's Hospital, Detective McFarland went to the Canton Hollow residence, where several other officers were conducting a search of the home. The scene had already been secured by other officers, and the defendant had already been placed in a police cruiser by the time Detective McFarland arrived. Although she was the lead detective on the case, she did not know who specifically had secured the scene or what specific protocols had been followed because she was not present at that time. She also did not know who had requested a forensic unit to respond to the residence. She explained that when she was first called about this case, she notified her supervisor, Lieutenant David Wise, who had arranged for officers to respond to the residence while Detective McFarland responded to the hospital. When she arrived at the residence, she walked through the living room, kitchen, and master bedroom, but she did not enter the front bedroom through which the victims escaped. She also looked in the refrigerator and noticed snack food items on the kitchen counters, but she did not look inside of the second, stand-alone freezer.

Detective McFarland stated that she conducted a "normal interview" with the victims and that a forensic interview, arranged by DCS, was conducted at a later date. Although she was not in the room during the victims' forensic interviews, she was present and could see and hear the live interview by way of video and a one-way mirror. She stated that it was common for a forensic interviewer to establish that a child interviewee understands the difference between the truth and a lie, but she could not specifically recall whether the interviewer had done so in this case. She acknowledged that the victims' accounts of the events varied "slightly, but . . . there's not a lot of major changes." She explained that because four years had passed since the victims escaped and because of the trauma that they suffered, she did not "expect their testimony [at trial] . . . to be verbatim the same as . . . [w]hat they gave us the initial interview."

Detective McFarland explained that she did not secure a search warrant for the Canton Hollow residence until June 4 because she did not have sufficient information

until both victims had completed their forensic interviews. She acknowledged that, although she had requested a DNA test of the mallet found at the residence, no DNA was collected, and she did not follow up on that matter. She also acknowledged that no DNA was collected from the can opener.

During cross-examination, Detective McFarland explained that being the lead investigator on a case did not require her to do everything related to the case herself. It was not her responsibility to ensure that the investigation at the Canton Hollow residence was conducted properly because she was at Children's Hospital. Lieutenant Wise was also present with her at the hospital, and he was receiving telephone calls from officers at the residence, and the teams were in communication with each other. Based on her interviews with the victims, she informed the officers at the residence which items of evidence were to be collected. The initial search of the residence on May 28 was conducted by consent. Her primary purpose in interviewing the victims at the hospital was to gain information about what evidence to collect because she knew that the victims would have a forensic interview at a later time.

DCS conducted its investigation in tandem with KCSO, but Detective McFarland was responsible only for the criminal investigation. Detective McFarland explained that DCS is responsible for arranging the forensic interviews. A.M.'s forensic interview required three compact discs to record the entirety of the interview, which Detective McFarland stated was "highly unusual" and was "a whole lot of information." She had never before known of a child's interview to be that long. Because A.M.'s interview took longer than expected, J.M.'s interview was not conducted until June 3, 2013, and his interview also required three compact discs to record it in its entirety. Detective McFarland explained that she waited until both victims had completed their forensic interviews to apply for the search warrant to ensure that their stories were consistent. She stated that, in her experience, she had never known a victim to be 100 percent consistent with his story throughout the entirety of a case, and, accordingly, she was unsurprised by the minor inconsistencies in the victims' accounts in this case.

Numerous officers participated in the execution of the search warrant, and Detective McFarland stated that the responsibility for logging evidence collected during the search was "distributed amongst the group." Detective McFarland explained that a DNA test of the evidence collected from the residence would not be helpful to the investigation because "[t]here were no allegations of an unknown perpetrator involved in this case" and because the DNA of the defendant and the victims was likely to be on items found in the house simply because they lived there.

On redirect examination, Detective McFarland acknowledged that one of the reasons that she interviewed the victims separately was to obtain unbiased statements.

Although she could not recall the exact number of people who assisted in the investigation, she had "create[d] a case file with all the information provided by everybody involved in the case." She acknowledged that the Canton Hollow residence remained unsecured between May 28 and the execution of the search warrant on June 4. On recross-examination, she explained that she could not legally keep a residence secured without a search warrant.

T.C., the defendant's son, testified that he had lived with the defendant off and on from January to May 2013. He stated that the defendant never spanked him and never spanked any of the other children, including the victims; however, he had seen the co-defendant hit the victims multiple times with his hands, fists, and objects, including a mallet and a belt. Although he saw the co-defendant handcuff the victims "[q]uite a few times," he never saw the defendant do so. T.C. stated that the co-defendant would get upset with the defendant if she tried to intervene in his discipline of the victims, recalling one occasion "where they got into it and he actually pushed her." T.C. acknowledged that when the co-defendant abused the victims, the defendant would verbally object but not physically intervene. T.C. described the co-defendant as "a very violent, aggressive person" and said that he heard the co-defendant threaten the defendant.

T.C. stated that the defendant had MS and "struggled with epilepsy," conditions for which she took medication. He said that the defendant was not physically strong, spending most of her days in bed because of "her health and her condition." He described the defendant as "an excellent mother" who loved all of the children the same. The defendant was responsible for disciplining T.C. and his sisters, and the co-defendant was responsible for disciplining the victims. T.C. denied ever seeing the defendant abuse the victims, stating that the worst thing he ever saw her do was "have them write sentences" when they got in trouble at school or "got caught stealing or something like that." He stated that food was available at the house for the victims to eat.

T.C. said that when he, the defendant, and co-defendant left for Gatlinburg, neither of the victims was handcuffed, and they were also not handcuffed when the family returned home the next day. When the family returned home, the co-defendant was angry at the victims and was "yelling at them and stuff like that, and spanked them and stuff like that," but T.C. did not know why the co-defendant was angry. Later that night, T.C. and the defendant went to a Pilot gas station. Around the time that T.C. was going to sleep on the couch in the living room, the co-defendant handcuffed both victims to a kitchen cabinet in a seated position.

During cross-examination, T.C. acknowledged that he had given inconsistent statements during the investigation of this case. He stated that he had previously lied in statements to police because he was afraid of the co-defendant and "just kn[e]w what he's

capable of." T.C. explained that when he once asked, "what are you guys doing?" after an incident of abuse, he directed his question to both the co-defendant and defendant because, "even though she wasn't doing it herself, . . . I felt like police should be called." T.C. acknowledged that he never told anyone about the abuse of the victims. He recalled that both victims were required to hold cans as a punishment.

A.C., the defendant's daughter, testified that she visited the defendant's residence only once from January to May 2013, but she did not go inside the home at that time. The next time she was at the residence was on May 26 to babysit the victims while the defendant and co-defendant were out of town. She arrived at the house at approximately 9:30 p.m. that day and found the victims sitting on the couch playing Xbox. She made macaroni and cheese, which both victims ate, and watched television in the master bedroom. A.C. denied that either victim was handcuffed when she arrived. She acknowledged that the victims appeared skinny, but she stated that they "always looked skinny." The next morning, she left "pretty early" for work, and the victims were still sleeping when she left.

A.C. stated that the defendant had never spanked her, and she never saw the defendant spank her siblings or the victims. She also never saw the defendant handcuff the victims; she did, however, see the co-defendant handcuff them "on a few separate occasions." She also had seen the co-defendant "spank the boys with the belt . . . up and down their backs and legs" and kick A.M. "in the gut, on the floor." Once, she saw the co-defendant stomp on one of the victims while he was on the ground. A.C. denied ever seeing the victims denied food but acknowledged that on one occasion, J.M. was not permitted to eat dinner after he had eaten all of the dessert cakes that the family had received from a food bank.

A.C. stated that because of the defendant's MS, she "had to go to the hospital a few times" and "slept a whole lot." She said that the defendant was not very strong. She described one occasion on which the co-defendant spit in the defendant's face during an argument, "and he threw the game Battleship at her head. And I seen him push her and hit her." A.C. believed that the defendant was sometimes afraid of the co-defendant. A.C. stated that the defendant valued her time with her and T.C., but she did not show favoritism. A.C. acknowledged that the defendant "did do a lot of drugs. And we didn't have a lot of money, and I don't think it was the best living situation for anybody there at the time."

During cross-examination, A.C. acknowledged that, at some point, the defendant asked her to stop coming to the house because A.C. would spend most of the time with her boyfriend down the street, and the defendant "felt like I was taking advantage of where she lived to go see my boyfriend." A.C. did not see the victims during the period from January to May 2013, until she went to babysit them the night of May 26. She stated

that the victims looked the same at that time as the last time she had seen them. She did not notice any injury or swelling to A.M.'s foot, but A.C. explained that the house "was already dark" when she arrived. She explained that although she and A.M. were both 16 years old at the time, she was babysitting the victims "because, usually, they would sometimes cause trouble." A.C. acknowledged that the victims told her they did not like living there, but they did not provide any details. A.C. cried while talking to the victims "because I was upset about not seeing them in a while" and she understood that "nobody seemed happy with the situation." She reiterated that she did not see any injuries on the victims.

A.C. said that when she talked on the phone with the defendant on May 27, the defendant asked her if the victims had played Xbox while the family was in Gatlinburg, and in the background of the call, A.C. could hear the co-defendant screaming and the victims crying. She recalled it being a long conversation, and the defendant asked her not to visit anymore. A.C. acknowledged that she had lied to detectives in previous statements because she was scared.

Theresa Palermo, the defendant's mother, testified that the co-defendant had "very poor" work habits and was often laid off or not working. He had worked for Mr. Handyman for "a little over a year," which was his longest sustained period of work. Ms. Palermo financially supported the defendant's family, providing groceries and paying bills. She saw the victims primarily when they came to her house, where they "had meals, we played games, that kind of thing." When the victims visited, "they were clean, . . . they behaved . . . . They ate what they wanted, and I sent our leftovers home for them so they could have extra food when they left the house." Ms. Palermo stated that she never saw the defendant discipline the victims. She acknowledged that she also never saw the co-defendant hit or spank the victims.

Ms. Palermo went to the defendant's house on occasion to bring them food, and she would see the victims while she was there. Although the family "lived in poverty" and "the trailer was very small, very cramped and old," nothing caused her alarm. She never went beyond the living area of the residence.

Ms. Palermo described the defendant's relationship to the co-defendant as "[d]ysfunctional," stating that the co-defendant "was very possessive" of the defendant, and "sometimes he wouldn't go to work so that he could stay home and watch over her." At times, the co-defendant would not permit Ms. Palermo to speak to the defendant on the telephone and would not give the defendant her messages. Ms. Palermo acknowledged that she "was unhappy about" the defendant and co-defendant's relationship and that she had lost respect for the co-defendant because he was unable to support the family. Ms. Palermo stated that the defendant had MS and a mental health disability.

-35-

During cross-examination, Ms. Palermo acknowledged that neither she nor her husband had been to the defendant's residence since Christmas of 2012 and that they did not see the defendant, co-defendant, or the victims from January to May 2013. She also acknowledged that, at times, the defendant would restrict her from seeing her grandchildren. Ms. Palermo acknowledged that she and the defendant had discussed the defendant's side of the story in relation to this case. She acknowledged that she did not believe that things "happened exactly the way that [the victims] said that it would happen" and that she told the detectives that the co-defendant's parents wanted to raise the victims and were either involved in the situation or did not care. She also acknowledged telling Lieutenant Wise that the co-defendant's parents were "[a]bsolutely" willing to destroy the family in order to get what they wanted.

Ms. Palermo described the defendant as "reclusive," stating that she did not leave the house much "when she's struggling with her mental illness." She acknowledged that the defendant had not always been truthful and had told significant lies in the past. The defendant "had a habit with medication," and on one occasion when Mr. Palermo's medication went missing, the defendant denied taking it, but they later discovered that she had indeed taken the medication. On another occasion Ms. Palermo and her husband had custody of one of the defendant's children, and during a custody mediation, the defendant accused Mr. Palermo of molesting her, which statement the defendant later recanted. Ms. Palermo acknowledged that the defendant was sometimes impulsive and acted without consideration of the consequences.

The defendant testified that she grew up in Indiana and had always "struggled with addiction," had MS, was epileptic, and had struggled with depression since she was 11 years old. She moved with her family to Tennessee when she was 15 years old. Later in life, she "found anxiety medication and pain medication to be a good way to escape from reality." She was married to Jason Cox for seven years before divorcing him and moving back to Indiana, where she lived with the co-defendant and his parents. She described the co-defendant as "insecure and possessive," stating that he would "check the mileage on the vehicle," chalk the car tires, and "keep track" of her. The co-defendant was "very good at this slow methodical almost brainwashing," but she "thought I was safe with a police officer." The defendant stated that the co-defendant "would not keep a job" because "it was almost like he needed to stay home and baby-sit me."

The defendant said that after finding two-year-old T.C. with "a red handprint on the side of his leg," she told the co-defendant that she preferred to discipline her own children, and she would respect his disciplining the victims. Her primary method of discipline involved having the children write sentences. In contrast, the co-defendant was "very military" and "was very withdrawn, unless it came to disciplining the children." She

-36-

said that the co-defendant's discipline was not extreme when the victims were younger and that he did not begin abusing the victims until the family moved to Tennessee. J.M. had ADHD, and the co-defendant would have him hold cans or spank him with a belt to discipline him. Eventually, the discipline "progressed to the point of a beating." Both victims had "received excessive spanks with the belt," "been handcuffed," been kicked to the ground, and been punched by the co-defendant.

The defendant testified that she was scared of the co-defendant, estimating that he had hit her five times. He had also yelled at and threatened her, telling her that he would "rip [her] throat out and show it to you." She stated that, as a stepparent, her "hands were very, very, very tied" when it came to removing the victims from the co-defendant. She also explained that the co-defendant controlled her "to the point I was so depressed" and "didn't know how to function myself anymore." She said that she tried to protect the victims and recalled that on one occasion when the co-defendant hit J.M. "in the face with a belt," she tried to intervene, and the co-defendant punched her in the face, spit in her face, and "threw a Battleship game at my head that literally put a hole in the wall beside my head." She wanted to leave the defendant, and she was saving money in preparation of leaving, but she stated it was difficult for her to leave because she would not see the victims again. She also feared that the co-defendant "almost had this brotherhood, the way he could talk with police officers, that -- very swindling and could get his way."

The defendant said that after an incident on a trip in January of 2013, the co-defendant "was upset and he didn't want [A.M.] going back to the school because of some bullying." She explained to the co-defendant that she could not homeschool A.M. through the homeschooling program he had found because it required her to have a college degree. Although the co-defendant was supposed to do the homeschooling, she "did try to do things" with A.M. Because the victims had "very low self-esteem and really were very depressed," the defendant "tr[ied] to interact with them on the things that they were good at and enjoy[ed]." The defendant "tried desperately not to" treat the victims differently than her own children, but she explained that because she saw her children only every other weekend or sporadically, she focused on them when they were with her.

The defendant explained that she did not want the victims to come on the family trip to Gatlinburg because of their "obvious bruises." When they left for Gatlinburg, the victims were not handcuffed to her knowledge, but she said that she and T.C. got into the car first, and the co-defendant "finished up in the house" before joining them. Because the victims lacked "the confidence levels" of her own children, the defendant asked A.C. to "come over there and she could have fun with them" while the family was in Gatlinburg. When they returned home from the trip, the co-defendant handcuffed the victims because he did not want them playing Xbox Live, and when he learned that they had done so, he "dress[ed] them down" and "handcuffed them both together to the cabinet." The defendant

took T.C. to a Pilot station in order to remove him from the situation because "it was hard to look at."

The defendant had a long conversation with A.C. that night, telling her that she "couldn't do this anymore." She acknowledged crying during the conversation but insisted that she did not raise her voice. She stated that, at that point, she was "emotionally dead," "just wanted to be asleep," and "didn't have the energy to be mad." Later that night, the defendant took some sleeping medication and "conked out pretty immediately." When she awoke the next morning, the victims were gone. She and the defendant looked for them around the neighborhood, and then the co-defendant returned to the house, and she continued to drive around looking for them.

The defendant acknowledged that she had once had A.M. soak his feet in Epsom salt to try to reduce the swelling, but she denied ever forcing him into the bathtub or holding him underwater. She also denied that she or the co-defendant had forced either victim to kneel on rice, although the co-defendant once made A.M. "scrub a floor" repeatedly one night, noting that the co-defendant often used cleaning as a form of punishment. She also denied ever hitting or burning either victim. The defendant denied depriving the victims of food but acknowledged that she once made J.M. "go without dinner" after he ate all of the Little Debbie snacks the family had received from a food bank. She also stated that she monitored the snacks at the house and "redirected" the victims to make better choices. She believed at one point that J.M. "almost was suffering from anorexia," but she reiterated that food was always available. She denied kicking A.M. in the face or hitting either victim with a can opener, stating that A.M. had "always had some of those marks on his head."

The defendant described one occasion on which she saw the co-defendant stomp on A.M.'s foot three to five times because A.M. had urinated on himself while handcuffed to a cabinet. She acknowledged that A.M. had a blister on his foot but said that she thought he got it from wearing shoes without socks and that "maybe it wasn't healing because [A.M.] was picking at it." She said that A.M. already had the blister when the co-defendant stomped on his foot. When she saw the co-defendant stomp on A.M.'s foot, she "took more medication and laid in the bed" because she had "never been a strong person" and "was scared to do anything." The defendant stated that the co-defendant would put socks over A.M.'s hands, securing them with tape, to prevent A.M. from picking at his injuries. She acknowledged that the co-defendant would have the victims hold cans of food as a punishment. She once saw the co-defendant put A.M. "in the tub and was not gentle with the way he was scrubbing him."

The defendant stated that she had unhandcuffed A.M. at times when she was alone with him. She asserted that she had protected the victims by not telling the co-

-38-

defendant things that had occurred while he was gone. She noted that the co-defendant would spontaneously come home during the workday to check on things, especially if she had not answered the telephone when he called. She stated that she once reported the abuse to CPS agents who had come to the house. The defendant speculated that the victims were angry that she could not save them from the co-defendant and that the co-defendant chose her over them.

The defendant denied restricting the co-defendant's parents from seeing the victims. She acknowledged that she did not see her mother beginning January of 2013 because the abuse had become so severe that she did not want Ms. Palermo to know what was going on or to think that she had failed. The defendant explained that she made false allegations against Mr. Palermo because she "panicked" and "did not want to lose my daughter." She also acknowledged that she had previously pleaded guilty to shoplifting. She acknowledged that the statement she gave to police after her arrest in this case "wasn't forthcoming" because she "was trying to cover for the situation altogether," and she feared that she would not be protected if she "told on" the co-defendant.

During cross-examination, the defendant acknowledged that, in addition to her shoplifting conviction, she also had other theft convictions. She explained that she did not tell the police about the co-defendant's abusing her because she was scared. She denied having a history of making false allegations when she was in trouble, stating, "I accept responsibility." She acknowledged that she had falsely "insinuated" that Mr. Palermo had acted inappropriately with her, but she reiterated that she made that allegation because she "didn't want to lose my daughter." She also acknowledged giving false statements to the police on the day of her arrest.

The defendant stated that the victims were causing problems and needed "some kind of psychological or some kind of help, because they were doing things that weren't . . . normal. And they were staying in trouble, doing the stealing, the lying, defecating in the vents. There was Miracle Grow stuck in Kool-Aid, several animals that were dying." She explained, however, that she and the co-defendant "had different forms of what we were trying, but we . . . were trying." She stated that she once told the police that the co-defendant was abusive and that she "was fearful for the boys," but the officers told her that she could not take the victims out of the home because she was a stepparent. From January to May 2013, the co-defendant's parents came to the house only once, but they did not come inside. During that same period, Mr. Palermo also came by to bring food, but he also did not come inside. A.C. did not come over during that period.

When the family returned home from Gatlinburg on May 27, A.C. had already left for work. Later that day, the defendant, co-defendant, and T.C. went to Hibachi Grill for dinner. The defendant then went to Sonic to get food for J.M. around 8:00 p.m.

She acknowledged that she did not get food for A.M. but stated that the co-defendant had placed the Sonic order. She talked to A.C. for approximately an hour and a half before going to the Pilot station. The defendant stated that she went to bed that night before the co-defendant handcuffed the victims, and she estimated that they were handcuffed sometime after 8:30 p.m. The next morning, the defendant called A.C. at 7:06 a.m. after approximately fifteen minutes of looking for the victims. She spoke to A.C. again at 7:10 a.m. and 7:23 a.m. She acknowledged that she, A.C., and T.C. were coordinating their efforts to locate the victims and bring them back to the house. She acknowledged that, before returning to the house, she met with A.C. and gave her $2,000 that she had "been nesting away" in her purse, asking A.C. to "please hold onto this money."

The defendant acknowledged that when the victims arrived at Children's Hospital, they "were very small," but she explained that "their mother was small, so I thought maybe that was the way it ran in the family." She denied that A.M. ever defecated on himself and stated that she did not notice that the victims were dirty or smelled bad because she "stayed in bed." She reiterated that there was plenty of food in the house and that, although the victims had to ask for snack foods, she speculated that they "struggled with depression and that probably didn't help with an appetite."

The defendant said that she first noticed the swelling in A.M.'s feet after the co-defendant made him stand for a prolonged period. She stated that A.M. was not handcuffed every time that he was made to stand because sometimes he was forced to hold cans. She recalled A.M. being handcuffed to an upper cabinet "probably 15 times," sometimes standing for hours. On at least one occasion, A.M. was handcuffed overnight and had been standing for "at least 10 to 12 hours." She acknowledged that A.M. was not able to eat or use the bathroom during that period. She estimated that the longest A.M. had been handcuffed in a seated position was four hours. The defendant acknowledged that if the victims had not escaped on May 28, they would have been left handcuffed for at least eight hours.

The defendant also acknowledged that she told the police that the injuries to A.M.'s wrists were from his "digging" at the wounds and not from handcuffs. She also acknowledged that, before T.C. met with a DCS worker, she told him that A.M.'s wrist injuries were caused by his digging at his own wrists. The defendant acknowledged that, despite being ordered to have no contact with the victims or her minor children as a condition of her bond in this case, she had texted A.C. and T.C., but she insisted that she "didn't understand my restrictions with the children right away." She stated that she cleaned up the house after she was released on bond but denied throwing anything away.

The defendant stated that she did not seek medical treatment for the injury to A.M.'s foot because she was his stepparent. The defendant denied kicking or hitting A.M.

with a rolling pin, stating, "We didn't even own a rolling pin." She also denied that she had ever asked the co-defendant to handcuff the victims. The defendant stated that she did not realize the severity of the victims' injuries until she saw the photographs taken of them at Children's Hospital.

Upon this evidence, the jury found the defendant guilty as charged of 23 counts of aggravated child abuse and guilty of one count of the lesser included offense of reckless endangerment. The State dismissed one count. The trial court imposed an effective sentence of 24-years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the trial court erred by excluding the testimony of a defense witness and by preventing the defendant from presenting a defense and that the evidence was insufficient to sustain the convictions of aggravated child abuse against J.M.

*I. Exclusion of Expert Witness*

The defendant first asserts that the trial court erred by excluding the testimony of an expert witness, Doctor Brent Turvey, arguing that Doctor Turvey's testimony would have assisted the jury in evaluating the evidence. The State argues that the trial court did not err and, in the alternative, that any error was harmless.

At the February 21, 2017 hearing to determine the admissibility of Doctor Turvey's testimony, Doctor Turvey, a forensic scientist and forensic criminologist, testified that the defendant asked him to "examine this case, to perform crime reconstruction, crime scene analysis[,] and victimology." He explained that collecting and examining evidence requires scientific effort by qualified and properly-trained forensic personnel. Accordingly, in assessing any case, he first considered whether the crime scene investigators were properly trained, followed proper protocols, and objectively collected and tested evidence. A failure at any step of the investigation would cause the evidence to lack reliability.

Doctor Turvey described what he believed were investigative flaws in this case. He noted that FHS was not treated like a crime scene—no photographs were taken and no documentation collected—despite being the place where the victims were found. He also determined that the Canton Hollow residence was not properly investigated and that the documentation from that scene was "very poor." It was his opinion that the investigation in this case did not follow proper protocol, which "upset the overall integrity of the case and any conclusions that you make" based on that evidence. He stated that the investigators "abandoned their duty of care with respect to actually providing for good integrity of evidence and information to be provided . . . [for] reconstruction purposes."

-41-

Doctor Turvey testified that no physical evidence directly connected the defendant to the allegations in this case. As an example, he stated, "There's no evidence - - no physical evidence that the [defendant] . . . actually was the one that put the handcuffs on either of the victims if that happened." He also stated that no physical evidence linked the defendant to a rolling pin or mallet, noting that a "rolling pin was never actually found" and that the mallet was not tested for DNA. Additionally, Doctor Turvey stated that the allegations of abuse were inconsistent with the evidence, explaining that to determine whether injuries are consistent with alleged abuse, "you have to look at [the victims'] history and look at their victimology and determine whether or not there's a history of self-injury or self-abuse." He asserted that the victims in this case had "a documented history of that." He also noted that several of the victims' injuries were "actually in states of healing," indicating that they were not inflicted by recent abuse as alleged.

Doctor Turvey stated that the victims were allegedly handcuffed to a kitchen cabinet, but "[a]n examination of that from the photographs provided demonstrates there's no injuries to the wood of that cabinet, which would be there if they actually were struggling against those handcuffs." The photographs also showed that "the cabinets themselves appear to be full of items, making it impossible for one of [the victims] to pass through the cabinet" to escape. Doctor Turvey stated that all of these inconsistencies were "red flags," but he acknowledged that a red flag "does not prove that someone is lying, does not prove that someone has made a false allegation. What it demonstrates is, law enforcement needed to have examined the issue more carefully and explained it in context. Instead, these issues appear to not even have been recognized at all." Because of these deficiencies in the investigation, Doctor Turvey stated that the conclusions of law enforcement officers in this case were unreliable.

On cross-examination, Doctor Turvey stated that he had submitted a written proffer of seven statements, but he explained that the written statements were only examples of the issues on which he had developed an opinion in this case.[3] He stated that other issues "certainly . . . exist and other ones that may come up that . . . I'm not aware of." As an additional example of evidence being inconsistent with the victims' allegations, he noted that the victims could not have climbed through the window as they stated because a photograph showed "objects that are blocking the window."

In forming his opinions in this case, he relied on photographs, reports from law enforcement officers and DCS investigators, hospital records, victim statements, witness statements, and the defendant and co-defendant's statements. He estimated that he was provided fewer than 100 photographs in this case, which he noted "certainly was not enough for the type of crime that we're looking at." Not only was the number of

---

[3]     Doctor Turvey's written proffer was not included in the record on appeal.

photographs in this case inadequate, in his opinion, but they also were not "of the things that were pertinent . . . to a forensic investigation." He also stated that the video taken of the residence was "[e]xtremely poor quality."

Doctor Turvey reiterated that the physical evidence in this case did not corroborate the victims' accounts. He noted that the victims' statements "[d]idn't lead investigators to physical evidence that supported their statement," explaining that "a good statement will lead investigators to physical evidence that corroborates it." He explained further, "If [the victims] were handcuffed to the cabinets and were able to get through it or were trying to struggle against it, there should be damage to the cabinets, or the items in the cabinet would be removed and all over the place and found in disarray in the morning," but in this case, "[n]one of that's true." He acknowledged that the victims never said that they struggled against the cabinet, but he maintained that that was "the only legitimate and logical inference from what they're saying" and could "be inferred quite easily from the statement that they did give." He also said that the victims could not have crawled through the cabinet without removing items from cabinet, but "[t]he items were still in the cabinet" in the photographs, "ergo, they didn't go through them."

At the close of the hearing, the trial court determined that Doctor Turvey qualified as an expert in forensic criminology but concluded that his testimony would "by and large" consist of "his assessment of the strength of the evidence and the credibility of the witnesses," which "matters [are] uniquely the function of the jury." The court further found that "his testimony would not assist the jury in understanding the evidence, but, rather, would tend to substitute his assessment of the case for that of the jury," which would be "an inappropriate use of expert evidence in a trial." The trial court later issued a written order excluding Doctor Turvey's testimony at trial.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2009); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d

at 404 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

We agree with the trial court that Doctor Turvey's proffered testimony was an assessment of the strength of the evidence and the credibility of witnesses, which are issues squarely in the province of the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) ("Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."); *see also State v. Schimpf*, 782 S.W.2d 186, 193-94 (Tenn. Crim. App. 1989) (superseded on other grounds) ("Credibility of witnesses is a matter only for the jury.") Moreover, Doctor Turvey's proffered testimony would not substantially assist the jury in understanding the evidence or in determining a fact in issue. Accordingly, the trial court did not abuse its discretion by excluding Doctor Turvey's testimony.

## II. Exclusion of Evidence of Past Abuse

Next, the defendant contends that the trial court erred by preventing her from testifying that she had been the victim of violence and abuse in past relationships, arguing that this evidence was critical for her defense. The state argues that the trial court did not exclude the evidence but instead warned the defendant that such testimony would open the door for the State to present evidence of the defendant's violence in past relationships. Alternatively, the State argues that the record is incomplete to facilitate review of this issue.

Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, *see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and

(3) Whether the interest supporting exclusion of the evidence
is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

Here, the trial court ruled that the defendant could "go into any kind of violence between" her and the co-defendant "to explain [her] actions in response to what he did to the boys, according to her theory." As to evidence of the defendant's being the victim of violence in prior relationships and being "afraid of men," the trial court concluded that if the defendant offered such evidence, the State would be permitted to offer evidence of the defendant's acts of violence and aggression in her past relationships. Because the record reveals that the trial court limited the defendant's testimony only as it related to opening the door for the State to present potentially damaging evidence, the court did not prevent her from presenting a defense. Additionally, even if the trial court's ruling could be construed as an exclusion of evidence, because the defendant did not proffer her proposed testimony, the record is insufficient to facilitate our review of whether the evidence was critical to her defense. Accordingly, this issue lacks merit.

## III. Sufficiency of the Evidence

Finally, the defendant asserts that the State failed to present sufficient evidence to support her convictions for aggravated child abuse of J.M., arguing that the treatment of J.M. was not "especially heinous, atrocious and cruel," that J.M. did not suffer "serious bodily injury," and that the State presented no evidence of abuse in September of 2011, relating to counts 28 and 29 of the presentment. The State maintains that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence,

as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant to this case, "A person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim[.]" T.C.A. § 39-15-402(a). A person commits child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." T.C.A. § 39-15-401(a).

The defendant challenges the sufficiency of the evidence relevant to only eight of her convictions for aggravated child abuse by an act that was especially heinous, atrocious or cruel.[4] The challenged convictions are as follows: Count 3—handcuffing J.M. to A.M.; Count 9—hitting J.M. on the head with a rolling pin; Count 18—depriving J.M. of food; Count 20—handcuffing J.M. to the stove; Count 24—hitting J.M. with the rolling pin; Count 26—forcing J.M. to hold cans of food out to his side; Count 28—holding J.M. underwater; Count 29—handcuffing J.M. before holding him underwater.

The evidence adduced at trial, viewed in the light most favorable to the State, established that, on the night of May 27, 2013, the defendant repositioned the victims, handcuffing them to each other and to the kitchen cabinet. She did not activate the double lock on the handcuffs, allowing them to tighten on the victims' wrists. The evidence also established that, on at least one occasion, the defendant hit J.M. on the head with a rolling pin, causing him to bleed, and, after he fell to the floor from the initial hit, the defendant continued to hit him on the arms with the rolling pin. J.M. and the co-defendant testified that both victims had been deprived of food on multiple occasions as a form of punishment, and Doctor Perales testified that the victims' physical conditions were consistent with malnourishment and food deprivation. J.M. also testified that he had been handcuffed a "lot of times" to various locations, including the oven, and other evidence established that the defendant was the primary source of the abuse, handcuffing the victims on numerous occasions. Additionally, the evidence established that the defendant forced both victims to hold cans of food with their arms out to their sides for several hours at a time as punishment for getting food.

Finally, J.M. testified that sometime in 2012, the defendant handcuffed his hands behind his back and forcibly held his head underwater in the bathtub as a punishment for his defecating in a floor vent while handcuffed to the oven. A.M. also testified that the

---

[4] Although the defendant also includes count 27 in her appeal, the State dismissed that count, and the jury did not render a verdict on it.

defendant had held J.M. underwater on one occasion. Although the presentment charged the defendant in counts 28 and 29 with acts of aggravated child abuse occurring "[o]n or about the _____ day of September, 2011," and although J.M. testified that the bathtub incident occurred sometime in 2012, a variance between the date indicated in the presentment and the proof does not invalidate the conviction unless time is a material element of the offense. *See State v. Yates*, 395 S.W.2d 813, 814 (Tenn. 1965) (stating that the general rule is "except where a special day is essential, or where time is the essence of the offense, the time of the commission of the offense as averred in the indictment is not material, and the proof is not confined to the time charged"); *State v. Fears*, 659 S.W.2d 370, 374 (Tenn. Crim. App. 1983) *overruled on other grounds by State v. Harrison*, 270 S.W.3d 21 (Tenn. 2008); *State v. Howse*, 634 S.W.2d 652, 657 (Tenn. Crim. App. 1982) ("The [S]tate was not required to strictly show the[] offenses occurred during the dates alleged in the indictment . . . because there is no showing the dates alleged were essential to proving the offense or to the imposition of a defense." (citing *Prince v. State*, 529 S.W.2d 729 (Tenn. Crim. App. 1975))); *see also* T.C.A. § 39-11-201(a)(4). Consequently, the State was not required to prove that the defendant committed the acts charged in counts 28 and 29 in September 2011.

The defendant's handcuffing the victims to each other in a manner that allowed the handcuffs to continually tighten on the victims' wrists; hitting J.M. in the head with a rolling pin, causing him to fall to the ground bleeding and continuing to hit him on the arms; depriving the victims of food to the point of malnourishment; handcuffing J.M. to the oven for a long enough period of time that he defecated in a floor vent because he needed to use the bathroom; forcing the victims to hold cans of food out at their sides for several hours at a time; and handcuffing J.M. and holding his head underwater are all acts that support the jury's finding that these acts of abuse were especially heinous, atrocious, or cruel. Consequently, the evidence is sufficient to support the defendant's multiple convictions of aggravated child abuse against J.M.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE